**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

Digital Land Wireless, Inc.
3075 Fulton Street
Brooklyn, NY 11207,

Perfect Wireless Two LLC
187 Rivers Edge Drive
Milford, OH 45150,

Kal Electronics Inc.
3218 North Street
Nacogdoches, TX 75965,

Reemas Fashion, Inc.
2521 West State Street
New Castle, PA 16101,

Texas Mobile Solutions LLC
14405 FM2100 Road, Suite L
Crosby, TX 77532,

Plaintiffs,

v.

Arch Telecom Inc.
1940 W Corporate Way
Anaheim, CA 92801,

**Serve Upon:**
Accumera, LLC
911Central Avenue, #101
Albany, NY 12206

Arch Telecom of NY Inc.
1940 W Corporate Way
Anaheim, CA 92801,

**Serve Upon:**
Vijayant Ghai
575 Underhill Blvd., Suite 211
Syosset, NY 11791

Case No.  23-1582

T-Mobile USA, Inc.
12920 SE 38th Street
Bellevue, WA 98006

**Serve Upon:**
Corporation Service Company
300 Deschutes Way, SW
Suite 208, MC-CSC1
Tumwater, WA 98501,

and

The Portables Choice Group LLC
136 1st Street
Nanuet, NY 10954

**Serve Upon:**
Lawrence D. Melchionda
136 1st Street
Nanuet, NY 10954

## CLASS ACTION COMPLAINT
## AND DEMAND FOR JURY TRIAL

COME NOW THE PLAINTIFFS, Digital Land Wireless, Inc. ("Digital Land"), Perfect Wireless Two LLC ("Perfect Wireless"), Kal Electronics Inc ("Kal Electronics"), Reemas Fashion, Inc. ("Reemas"), and Texas Mobile Solutions LLC ("Texas Mobile Solutions"), by and through its undersigned attorneys, John Hermina, Esquire, and the Hermina Law Group, sues the Defendants Arch Telecom Inc., Arch Telecom of NY Inc. (jointly "Arch Telecom"), T-Mobile USA, Inc., ("T-Mobile") and Portables Choice Group, LLC ("PCG"), and as for their complaint, they state:

### Introduction

The Plaintiffs, in this case, represent a tiny fraction of the number of the mostly minority-owned businesses who were betrayed by Defendant T-Mobile and its so-called Master Dealers.

T-Mobile misled the nation, the Congress of the United States, and the Plaintiffs when its Executive said that "hundreds of stores" would be opened after the merger with Sprint.

It is not corporate greed and dishonesty that the Plaintiffs challenge here. Rather, it is T-Mobile and Defendants' blatant violations of the law which the Plaintiffs seek to address through this action.

### The Dirty Game of Squeeze and Buy

T-Mobile played a dirty game of *"squeeze and buy."* T-Mobile knew that the initial terms of the Plaintiffs' Agreements with the Defendants lasts until June of 2024, but T-Mobile conspired with its Master Dealer (Arch Telecom) to create an earlier and artificial termination date (March 2023).  And, over a period of months and months before March 2023, T-Mobile allowed (and is still allowing) Arch Telecom to contact the Plaintiffs to work them over. When Thomas Salvato of Arch Telecom called the Plaintiffs, he offered to buy their viable and profitable stores for little to nothing. And whenever it can, Arch Telecom attempts to close the Plaintiffs' stores for absolutely zero compensation, depriving them of their livelihood and disgorging them of their investments. This is occurring as of the time this Complaint is being filed.

### Relevant Facts

1. Plaintiff Digital Land is a community-based domestic corporation located in Brooklyn, New York. The Plaintiff has served the Cyprus Hills Community of Brooklyn since 2011, and it previously served East New York since 1998.

2. Plaintiff Perfect Wireless is an Ohio limited liability company; Plaintiffs Kal Electronics and Texas Mobile Solutions are Texas companies; and Plaintiff Reemas is registered in the Commonwealth of Pennsylvania.

3. Defendant T-Mobile USA, Inc. is a publicly traded for-profit corporation (under NASDAQ:TMUS). Defendant is headquartered in Bellevue, Washington.

4. Defendant Arch Telecom Inc. is a corporation with a principal place of business located in Anaheim, CA 92801. Defendant Arch Telecom of NY Inc. is a domestic corporation formed under New York Business Corporation Law §402. Upon information and belief, the two Arch entities are a single integrated enterprise and are jointly responsible for the harm to Plaintiffs as set forth herein. The two Arch entities will hereinafter be referred to as Arch Telecom.

5. During the relevant period, Thomas Salvato was a Director of Arch Telecom. However, Salvato has acted directly and indirectly as an agent of T-Mobile directly and indirectly through various entities such as the Portables Choice Group, LLC ("PCG") and its predecessor companies.

6. Defendant PCG is a New York limited liability company. This Defendant states publicly that it is comprised of two T-Mobile distributors: "Portables Unlimited Inc." and "Choice Products and Services Inc." New York Secretary of State records show the corporate formation of PCG to be March 9, 2021, but Defendant's website suggests that the consolidation occurred in July of that year. PCG claims to operate over 284 T-Mobile stores.

7. Defendant PCG has entered into contractual relationships with each of the Plaintiffs in or around June 2021. Under the terms of the Agreement, the initial term is three (3) years long.

8. Arch Telecom acquired PCG on or around August 18, 2022, and it announced in a public statement to the Plaintiffs and numerous other dealers that:

> "With this latest acquisition, Arch Telecom's portfolio consists of over 400 locations in 32 states… For all PCG Sub-Dealers, your experience will be business as usual. The majority of PCG TPR-S field and back-office support staff will become a part of Arch Telecom and will continue to support you. Commissions will continue to be paid at the normal cadence. All PCG sub-dealer agreements and

guaranty obligations will be transferred to Arch Telecom and remain in full force. All T-Mobile operating and brand standards expectations will remain."

9. Arch Telecom claims to be the third largest T-Mobile retailer, with over 400 stores in the 32 states.

## Choice of Law and Jurisdiction

10. The Agreement between the Plaintiffs and Defendant PCG provides New York as the choice of law, and it requires the parties to consent to the exclusive jurisdiction of certain state courts in the State of New York "and any Federal Court in New York."

## T-Mobile's Role And Its Relationship To Arch Telecom and the Plaintiffs

11. The Plaintiffs are essentially community-based T-Mobile stores, and they are what T-Mobile and Arch Telecom prefer to call "Sub-Dealers." T-Mobile and Arch Telecom hold the latter out to be a "Master Dealer." Using its operating standards, T-Mobile controls substantially every aspect of the Plaintiffs' business:

- T-Mobile determines the size of the store;
- It determines the signage (to the inch) and the appearance of the store;
- It determines the number of personnel in each store;
- It determines the store hours of workers;
- It has a universal attire uniform policy;
- It establishes the EEO guidelines for each store;
- It establishes social media guidelines;
- It controls the customer relations activity, and it operates a customer service department;
- It determines the refund policies and the restocking fees;
- It controls the product marketing;
- It controls the store inventory;
- It controls financial aspects of the operation of the business, including credit card transactions and the T-Mobile credit cards;
- It controls the sales, and it even sends an armored truck to pick up payments from the stores on a bi-weekly basis;
- It controls and determines the commission structure; and
- T-Mobile operates as the master/principal of "master dealers" such as Arch Telecom, directing them to execute such significant actions as store eliminations.

12. As a Master Dealer, PCG and Arch Telecom owed their Sub-Dealers a duty to warn the Plaintiff of any events or changes that might impact the Plaintiffs' earnings, store operations, and livelihood. The District Managers of these Defendants performed audits designed to protect the Plaintiffs. Defendants were entrusted with honestly interacting with the Plaintiffs, including the safekeeping and disbursement of their funds.

13. When the acquisition by Arch Telecom of PCG became effective on or about September 1, 2022, it assumed the liabilities and received the assets of PCG.

**Misrepresentations and Concealment of Material Facts Regarding Store Closures and the Resultant Harm**

14. In April of 2018, T-Mobile announced its merger with Sprint, and the Presidents of both companies began a campaign designed to promote the merger and secure the necessary governmental approvals. Among other representations, T-Mobile promised that stores would be created – not eliminated. By way of example, John Legere, CEO of T-Mobile, stated during a joint announcement with his Sprint counterpart as to the two merged companies:  "we'll build hundreds of stores."  https://www.youtube.com/watch?v=1nsbmtwMrgY And, while the reference to building hundreds of stores was made regarding rural areas,  Legere touted "jobs" as "another reason this [merger] deal makes so much sense." In another public appearance in April of 2018, the CEO of Sprint stated, as to the merged company: "We plan to open hundreds and hundreds of new stores." https://www.youtube.com/watch?v=RicP_VsQ3ZM T-Mobile's public promises misled each and every one of the Plaintiffs.

15. T-Mobile never informed Sub-Dealers, prior to the approval of the merger, that it planned to close stores such as Plaintiffs' stores.

16. Arch Telecom and PCG also concealed from the Plaintiffs and numerous other Sub-Dealers that T-Mobile planned on closing stores – when such information became known to them. This concealment of a material fact continued through the fall of 2022.

17. T-Mobile managers who went to audit the Plaintiffs' stores continued to represent to Plaintiffs that business is continuing as usual. Some of these managers actually represented to Plaintiffs that T-Mobile is actually creating more stores, not eliminating them.

18. In its August 18, 2022, announcement that it acquired PCG and its stores, Arch Telecom stated to the Sub-Dealers that as "Sub-Dealers, **your experience will be business as usual**." It also represented that the Sub-Dealers would continue to receive "support" from the Master Dealer.

19. T-Mobile and Arch Telecom continued to pretend as if business was as good as usual, urging Sub-Agents to continue to renovate and renew existing leases for as long as five (5) years. This gave the Plaintiffs the absolutely false impression that, even after the merger, their respective small businesses would continue to thrive.

20. In reliance on the promises and concealments of T-Mobile Arch Telecom and PCG, the Plaintiffs incurred significant renovation costs. By way of example, Digital Land incurred over $150,000.00 to raise Plaintiff's Brooklyn store to T-Mobile standards. These renovations, required and approved by T-Mobile and Arch Telecom, included remodeling the space and purchasing new furniture and equipment.

21. In reliance on the promises and concealments, the Plaintiffs renewed their leases, causing them to be indebted for significant rental payments.

22. In reliance on the promises and omissions of fact, the Plaintiffs took out loans during the Pandemic to ensure that the business of T-Mobile continues to survive, thrive and grow. The Plaintiffs – unlike the Defendants – were loyal.

23. The Plaintiffs and numerous other Sub-Dealers entered into the June 11, 2021, contracts in good faith, fully believing the representation that business would go on as usual. When the Plaintiffs attempted to take their time to review the Agreements, PCG sent an email requesting the return of the executed agreements "by 6/25/21 to avoid any possible DELAYS TO COMMISSION CHECKS." (capital letters in original).

24. At the time the Sub-Dealer Agreements were sent to each of the Plaintiffs, Defendant PCG was under a duty to provide full and complete information regarding T-Mobile's plans to close and terminate Plaintiffs' stores. PCG breached that duty of loyalty.

25. PCG and/or Arch Telecom were aware of T-Mobile's plans to eliminate Sub-Dealerships, but they failed to provide that information to Plaintiffs.  Renovations and renewals were being required and approved, and Arch Telecom was suggesting that business would go on as usual. The Plaintiffs believe, and therefore allege that T-Mobile planned to close its Sub-Dealers program and it knew that it would be closing Plaintiffs' stores, but it failed to provide the Plaintiffs with information regarding its plans, or its impending closures.

26. As noted above, Arch announced its acquisition of PCG to take place on September 1, 2022. On November 21, 2022, and within approximately two months of the acquisition announcement, Arch Telecom sent Plaintiffs a Notice stating that "**T-Mobile USA, Inc.** ("T-Mobile") **is exercising its right to terminate [your] location**… Sub-Dealer must cease operations and close each of its Locations [in March of 2023]."

27. Within days after Arch Telecom notified Plaintiffs that they must close their stores, Plaintiffs and numerous other Sub-Dealers received telephone calls or emails from Thomas Salvato of Arch Telecom. During these calls or in the emails, Mr. Salvato reminded Plaintiffs that T-Mobile has effectively terminated their businesses, but that Arch Telecom would be willing to purchase their stores for a negligible amount of money. The offers did not begin to compensate the Plaintiffs for the cost of renovation (required and approved by T-Mobile), let alone the loss of commissions, investment and profits.

28. Prior to the merger between T-Mobile and Sprint, the closest T-Mobile store to Perfect Wireless Two LLC  ("Perfect Wireless") was seven miles away. The location of the store was considered a rural area, where the T-Mobile Executive had falsely pledged to create "hundreds of stores."

29. Due to the merger, multiple Sprint stores that became T-Mobile stores came within proximity of Plaintiff Perfect Wireless, and the number of T-Mobile stores in that area grew to five, after only being two. Even with the new competition, the store remained productive and there was no justification either for terminating the store, or for failing to compensate the Plaintiff for the bad faith termination.

30. The last of the Agreements entered into between the Plaintiffs and the Defendants was the Sub-Dealer Agreement offered by PCG on June 11, 2021. During a conference call with all of the Sub-Dealers on August 18, 2022, an Arch Telecom Officer informed the Plaintiffs that Arch Telecom acquired PCG, and he promised that Plaintiffs can expect profitability and "business as usual." One day later, the Plaintiffs received the formal Arch Telecom-PCG acquisition announcement stating that the effective date of the acquisition is September 1, 2022.

31. On September 1, 2022, Arch Telecom informed the Plaintiffs and all Sub-Dealers that "T-Mobile has decided to end the [Sub-Dealer] program." On November 21, 2022, Arch Telecom further advised the Plaintiff that the store location was being terminated effective "March 2023."

32. Beginning on June 11, 2021, Defendants PCG and Arch Telecom engaged in the conversion of commission funds, which were to be distributed to Perfect Wireless. The conversion occurred when the said Defendants increased the target for the number of activations, which eliminated the threshold for receiving a bonus.

33. The targets, which had been set by T-Mobile, were raised by Defendants with the intent to convert the bonuses, or with intent to deprive the Sub-Dealers of the same. PCG refused to issue the bonus after telephone units were sent to the Defendants, and when the dispute over the bonuses arose, the Plaintiffs requested the return of the telephones, but Defendant PCG refused, keeping both the telephones and the bonuses.

34. Plaintiff Perfect Wireless lost significant funds, as it expected returns on the long term investment in the business, because the program was terminated shortly after the merger. The Plaintiff was forced to buy equipment more expensive than the market price. The Defendants approved a 5-year lease extension. And, the Plaintiff and numerous other Sub-Dealers are now required to repay Pandemic-related disaster-loans, which Plaintiffs had to incur to keep their respective stores open pursuant to Defendants' instructions. In addition to the above losses, the Plaintiff also lost commission earnings and profits.

35. When Defendant T-Mobile represented that it would open "hundreds of stores" nationwide, Kal Electronics Inc ("Kal") had ample reason to believe that it would not only survive, but that it would thrive in the newly-merged company.

36. At the time Kal became a T-Mobile Sub-Dealer, Kal's location was considered rural. While promoting the merger, T-Mobile represented that "hundreds of stores" would be added, particularly in rural areas. This representation was clearly false as Kal experienced first-hand.

37. Kal developed its business and became profitable. Yet, as is the case with other Plaintiffs, Arch Telecom, advised this Plaintiff that T-Mobile would terminate Kal's location effective March 2023.

38. Arch Telecom was unable to explain T-Mobile's and its own tortious conduct in unilaterally terminating Plaintiff Kal's viable business. Presumably, the business was being terminated because Defendants felt that because of performance issues, it needed to close. Yet, the Defendants were seeking to take Plaintiff's business and keep it to themselves. Indeed, in the same notice of termination, Arch Telecom's Tom Salvato stated: "We would like to gauge your interest in selling your location to Arch Telecom."

39. Defendant Arch Telecom offered Kal $35,000.00, and the offer kept on increasing until it reached $100,000.00. The Plaintiff could not accept the offer, which represented less than four months of commission earnings. The Plaintiff had spent approximately $120,000.00 to renovate its T-Mobile store. Therefore, Arch Telecom's bad-faith offer was unacceptable. The Plaintiff lost significant funds in the form of investment, renovations, commission earnings, loans, and lost profits.

40. Plaintiff Reemas opened the first T-Mobile location on September 1, 2016, in New Castle, Pennsylvania, and it opened the second location in Canfield, Ohio, on February 20, 2017. Ultimately, the Plaintiff entered into an Agreement with PCG in June of 2021, which was followed by the Arch Telecom's PCG acquisition announcement in August of 2022. Within weeks of the acquisition, the Plaintiff received a notice of termination. Specifically, on

September 1, 2022, Plaintiff received an email from Thomas Salvato, in which the latter stated that "T-Mobile has decided to end the TPR-S Sub-Dealer program… We would like to gauge your interest in selling your location to Arch Telecom…".  Stated differently, the Defendants decided to close the Plaintiff's business but to keep that business for themselves. The Defendants also decided to wrongfully close Plaintiff's second location.

41. Plaintiff Reemas operated two successful T-Mobile stores until it received notices that it must either sell the stores to the Master Dealer or cease to operate altogether. The notices stated that after March 31, 2023, Plaintiff will no longer be able to sell T-Mobile products and services.

42. Reemas' two stores were performing well, and there existed no justification for closing them. Acting in bad faith, Arch Telecom initially offered the Plaintiff $40,000.00 for the two locations, and then the offer was increased to $60,000.00. The higher amount represents approximately two months of commissions, and such amount is completely unfair and unreasonable.

43. As recently as June 2022, T-Mobile insisted that Plaintiff Reemas remodel the New Castle location, and it cost the Plaintiff approximately $80,000.00 for the renovation. In demanding the renovation, T-Mobile conveyed the clear impression that the business would continue at least until 2027. Arch Telecom was clearly operating in bad faith when it attempted to acquire the stores for an amount that is less that what the Plaintiff paid in renovation for only one location. The Plaintiff lost funds in the form of investment money, commission earnings, renovations and future profits.

44. Plaintiff Texas Mobile Solutions owned two stores in Houston, Texas, which it operated on behalf of T-Mobile as a Sub-Agent. The Plaintiff served in the capacity of Sub-

Agent since 2015, and a year later, the Plaintiff purchased a third store. By 2017, Texas Mobile

Solutions owned a total of six T-Mobile stores. One of the stores opened by the Plaintiff in 2017

was in Leandar, Texas. It was the first T-Mobile store in the area.

45. T-Mobile closed three of Texas Mobile Solutions' stores and placed signs on the

stores redirecting traffic to T-Mobile corporate stores. T-Mobile has closed two stores effective

March of 2023, and Arch Telecom has made an offer to purchase the remaining store for the

equivalent of less than three-months' commission earnings.

46. All of Plaintiffs' six stores were profitable and there was no justification for closing

any of them. The closing of the stores was contrary to the public statements made by T-Mobile

and inconsistent with the private conversations the Plaintiff had with T-Mobile's managers.

47. Two stores, which have five-year leases are closing, and Arch Telecom offered to pay

$75,000.00 for the one and only remaining store. The Plaintiff lost funds in the form of

investment, commissions, leases, renovations, a loan and lost profits.

48. Arch Telecom announced the closure of stores and then posed as a guardian angel

who is willing to save Plaintiffs by purchasing their location(s). For the most part, the forced

distress-sale offers are the equivalent to a few months' commission. These distress-sale offers are

for pennies on the dollar, considering: the business investments made by the Plaintiffs, the

potential commission earnings, the renovations and the lease extensions, which were entered into

at the direction of T-Mobile and/or Arch Telecom.

49. When Plaintiffs contacted T-Mobile to express their shock at the unexpected

terminations, executives of T-Mobile directed the Plaintiffs to contact Arch Telecom. And, when

Plaintiffs contacted Arch Telecom regarding the business eliminations, they were informed that

the decision to terminate was entirely T-Mobile's, but that Arch Telecom is willing to buy some

of the stores for a small amount of money. Both T-Mobile and Arch Telecom hid from Plaintiffs an internal conspiracy whereby T-Mobile gave Arch Telecom a termination date, but allowed the latter to squeeze the Plaintiffs by closing whatever stores that it can and buying whatever stores that it wishes to buy. It should be noted that store sales and transfers cannot occur without T-Mobile approval. Hence, no part of Defendants' dirty game could not be executed upon without the blessing of T-Mobile.

50. T-Mobile's concealed and undisclosed corporate strategy was to eliminate Sub-Dealers nationwide. To achieve its strategy, T-Mobile incentivized Master Dealers such as Arch Telecom to take over well-performing stores such as the ones owned by Plaintiffs. T-Mobile and Arch Telecom deliberately, intentionally and willfully withheld information regarding the plans to close Plaintiffs' stores.

51. Upon information and belief, T-Mobile directs Master Dealers to take whatever steps as are necessary to eliminate Sub-Dealers such as the Plaintiffs. T-Mobile is fully aware that these steps include the Master Dealer's sending out of notices terminating the contractual relationship between the Plaintiffs and PCG and causing the Plaintiffs to lose enormous funds in investment, renovation costs, lease extension, loans, commissions and future revenues.

**COUNT ONE**
**FRAUD**
**(T-Mobile, Arch Telecom and PCG)**

52. The Plaintiffs incorporate by reference all of the allegations made above as if the same are fully set forth herein and further state:

53. For that the Defendants made representations and concealed from the Plaintiffs material facts regarding the plan to eliminate stores, or to keep some of the stores for its Master Dealers. T-Mobile went as far as to misrepresent publicly and to the Plaintiffs that stores would be open and

would operate for years to come. Indeed, the misrepresentation of material facts also took the form of advising, encouraging and even requiring the Plaintiffs to renovate their stores and to renew their leases – giving the false impression to Plaintiffs that their small businesses will continue to exist and be profitable. T-Mobile also hid and concealed from Plaintiffs that it agreed with Arch Telecom to lie to Plaintiffs regarding the actual termination date while pushing the Plaintiffs to simply give up their stores for next-to-nothing, or for absolutely nothing, if it can be done.

54. The Plaintiffs justifiably relied upon Defendants' omissions and misrepresentations to their detriment. In fact, the Plaintiffs took significant steps to renew their leases, take out loans and renovate their stores, and these steps were encouraged and approved by T-Mobile and Arch Telecom.

WHEREFORE, your Plaintiffs pray a judgment against the Defendants in the amount of One Hundred Million Dollars ($100,000,000.00) in compensatory damages, plus punitive damages in the amount of One Billion Dollars, plus attorneys' fees and costs of suit.

## COUNT TWO
## PROMISSORY ESTOPPEL
## (T-Mobile, Arch Telecom, and PCG)

55. The Plaintiffs incorporate by reference all of the allegations made above as if the same are fully set forth herein and further state:

56. For that, alternatively, the Plaintiffs allege that they suffered damages under a promissory estoppel theory.

57. There were explicit promises – by all Defendants – that Plaintiffs can expect to continue to conduct their business at their stores, and such promises were made publicly by T-Mobile and when the Defendants directed and approved renovation plans and lease extensions.

58. The initial term of the Agreement, which the Defendants demanded that the Plaintiff sign, ends in June of 2024.  This is in accordance with ¶13 of PCG's Agreement with each Plaintiff. This further gave each Plaintiff the impression that the relationship was continuous.

59. It was foreseeable to the Defendants that the Plaintiffs would rely upon such promises, and the Plaintiffs were injured as a result of such reliance. Plaintiffs' damages include the taking out of disaster loans, renovations, lease renewals, loss of investments, loss of commissions and loss of profits.

WHEREFORE, your Plaintiffs pray a judgment against the Defendants in the amount of Ten Million Dollars ($10,000,000.00) in compensatory damages, plus attorneys' fees and costs of suit.

## COUNT THREE
## NEGLIGENT MISREPRESENTATION
### (T-Mobile, Arch Telecom, and PCG)

60. The Plaintiffs incorporate by reference all of the allegations made above as if the same are fully set forth herein and further state:

61. For that, the Defendants owed the Plaintiffs a duty to exercise care in providing information with accurate and truthful information, which the Defendants knew the Plaintiffs would act upon.

62. The Defendants knew that the Plaintiffs would act upon their statements that stores would be created (not eliminated), that they needed to renovate their stores for the long term, and that they needed to extend their leases in contemplation of extensive future business. The Defendants incurred an additional duty of care when they knew that the Plaintiffs would act on these misrepresentations and the false impressions Defendants gave to Plaintiffs.

63. The Plaintiffs justifiably relied on the statements by engaging in-store renovations and extending their leases.

64. Defendants' statements, encouragements, and approvals of store renovations were factually and legally caused by Defendant's negligence or lack of due diligence.

65. The Plaintiffs relied on the statements to their detriment.

WHEREFORE, your Plaintiffs pray a judgment against the Defendants in the amount of One Hundred Million Dollars ($100,000,000.00) in compensatory damages, plus attorneys' fees and costs of suit.

**COUNT FOUR**
**NEGLIGENCE**
**(T-Mobile, Arch Telecom, and PCG)**

66. The Plaintiffs incorporate by reference all of the allegations made above as if the same are fully set forth herein and further state:

67. For that T-Mobile, Arch Telecom, and PCG owed the Plaintiffs a duty of care to warn the Plaintiffs of the impending closings of the latter's respective stores. The Defendants are not only contracting parties with the Plaintiffs, but they are also fiduciaries who owed the Plaintiffs an additional duty not to cause the Plaintiffs harm.

68. The Defendants breached these duties by failing to warn the Plaintiffs that stores would be closing, and this caused, factually and legally, Plaintiffs to lose investments, funds for lease extensions, disaster loans, commissions and future profits.

69. Defendants also owed the Plaintiffs a special duty of care when the former continued to urge Plaintiffs to take on loans, renovate the stores, and extend their leases without exercising due diligence in learning that there would be impending store closings.

70. The breaches of these duties of care caused, factually and legally, harm to the Plaintiffs who have lost and will lose millions of dollars on account of Defendants' conduct.

WHEREFORE, your Plaintiffs pray a judgment against the Defendants in the amount of One Hundred Million Dollars ($100,000,000.00) in compensatory damages, plus attorneys' fees and costs of suit.

## COUNT FIVE
## BREACH OF CONTRACT
### (PCG and Arch Telecom)

71. The Plaintiffs incorporate by reference all of the allegations made above as if the same are fully set forth herein and further state:

72. For that, the contracts between the Defendants and the Plaintiffs provide for an initial term of three years beginning in June 2021.

73. The Plaintiffs are entitled to the benefit of the Agreement for at least the initial term. Moreover, Defendant Arch Telecom made written promises in its acquisition announcement that are contractually binding. These promises include: that the "experience will be business as usual" that services by "field and back-office support staff" would continue. These promises were breached by Arch Telecom.

74. The Plaintiffs have performed all conditions precedent under the Agreements and have attempted to secure Defendants' retraction of the breach to no avail.

75. As a result of the breach, the Plaintiffs have lost significant funds in the form of investments, loans, lease extensions, renovations, lost commissions, and lost profits.

WHEREFORE, your Plaintiffs pray a judgment against the Defendants in the amount of One Hundred Million Dollars ($100,000,000.00) in compensatory damages, plus attorneys' fees and costs of suit.

**COUNT SIX**
**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALINGS**
**(PCG and Arch Telecom)**

76. The Plaintiffs incorporate by reference all of the allegations made above as if the same are fully set forth herein and state:

77. For that Defendants PCG and Arch Telecom worked directly with T-Mobile to prevent Plaintiffs from enjoying the benefits under the contracts. Pursuant to recent New York law, the Plaintiffs assert a claim that is separate from their count for breach of contract and further state:

78. Implied in the contracts between the Plaintiffs, on the one hand, and PCG and Arch Telecom, on the other, is a covenant of good faith and fair dealings. Pursuant to the covenant, the Defendants were to refrain from depriving the Plaintiffs of the fruits and benefits under the agreements.

79. As an example of Defendants' bad faith, PCG threatened to delay commissions payments if the Plaintiffs did not sign the June 2021 Agreements. The Plaintiffs were forced to accept the Agreements with all of the unconscionable provisions without any meaningful opportunity to review the Agreements or to consult with counsel.

80. PCG and Arch Telecom breached the implied covenant of good faith and fair dealings when they attempted to terminate PCG's Sub-Dealer Agreements with the Plaintiffs where no grounds for such terminations existed. Plaintiffs' stores were performing to Defendants' expectations. They brought to Defendant T-Mobile goodwill in Plaintiffs' respective communities, and in return, the Defendants betrayed the Plaintiffs.

81. Arch Telecom claimed that the terminations came from T-Mobile, but upon information and belief, Arch Telecom was merely directed by T-Mobile to perform the dirty

work of grabbing Plaintiffs' stores – irrespective of how the stores performed. T-Mobile left Arch Telecom to decide the means by which to eliminate Plaintiffs' stores; ergo, it deliberately left for Arch Telecom the manner in which to deprive all Plaintiffs of their commission earnings and their livelihood. Alternatively, it conspired with Arch Telecom to the same effect.

82. As further example of Defendants' bad faith is PCG and Arch Telecom's moving of the target number for earning a bonus so as to deprive Plaintiffs of such earnings. The said Defendants made claims that the Plaintiffs did not achieve particular metrics in order to reduce Plaintiffs' commissions without providing Plaintiffs with the confirming data. Additionally, because of the lack of support and lack of access to reporting from Arch Telecom, there is no clarity as to what commissions are due to the various employees of the Plaintiffs who have family obligations and must be compensated.

83. Arch Telecom has been collecting fees out of commission payments, but it has failed – since it acquired PCG – to provide any of the services for which it collects such fees. As part of the "squeeze and buy" scheme, the Plaintiffs have received no support or information needed to operate the stores. Arch no longer assists with the employee background screenings, which is a function that the Defendant undertook to perform. The Defendants have not provided any information regarding the status of residuals. Moreover, the Plaintiffs have been left in complete disarray with respect to the closing of the stores. The Defendants have not informed the Plaintiffs as to how to deal with outstanding leases that are as long, in some instances, as five years.

84. Arch Telecom acted in bath faith when it caused the Plaintiffs to believe that 'all is well' and that they should renew their leases and conduct their renovations. Arch Telecom hid from the Plaintiffs the fact that the renovations would only benefit Arch Telecom, which planned all along to take over the stores or close them in favor of T-Mobile.

WHEREFORE, your Plaintiffs pray a judgment against the Defendants in the amount of One Hundred Million Dollars ($100,000,000.00) in compensatory damages, plus attorneys' fees and costs of suit.

## COUNT SEVEN
## TORTIOUS INTERFERENCE WITH CONTRACTS
### (T-Mobile)

85. The Plaintiffs incorporate by reference all of the allegations made above as if the same are fully set forth herein and further state:

86. For that, contracts existed between the Plaintiffs and PCG, and T-Mobile was aware of such contracts.

87. T-Mobile intentionally procured PCG's breach of contract without justification. Specifically, T-Mobile directed Arch Telecom to close Plaintiffs' stores regardless of how such stores perform. Plaintiffs' stores were meeting the Defendants' performance expectations, and there is no economic justification for T-Mobile's tortious conduct in inducing the breaches of contracts.

88. T-Mobile's conduct was intentional, and its tortious acts were committed with malice or its functional equivalent.

89. Due to Defendant T-Mobile's actions, the Plaintiffs suffered significant harm in the form of funds for renovations, lease extensions, loans, lost commissions, and future profits.

WHEREFORE, your Plaintiffs pray a judgment against the Defendants in the amount of One Hundred Million Dollars ($100,000,000.00) in compensatory damages, plus punitive damages in the amount of One Billion Dollars, plus attorneys' fees and costs of suit.

**COUNT EIGHT**
**TORTIOUS INTERFERENCE WITH CONTRACTS**
**(Arch Telecom)**

90. The Plaintiffs incorporate by reference all of the allegations made above as if the same are fully set forth herein and further state:

91. For that, there existed contracts between the Plaintiffs and PCG. Arch Telecom was aware of such contracts.

92. Arch Telecom intentionally procured PCG's breach of contract without justification. Specifically, Arch Telecom ended Plaintiffs' contractual relations with PCG, thereby severely damaging the Plaintiffs economically. The Plaintiffs were meeting the Defendants' performance expectations, and there is no economic justification for Arch Telecom's tortious conduct in inducing the breaches of contracts.

93. Arch Telecom's conduct was intentional, and its tortious acts were committed with malice or its functional equivalent.

94. As a result of Defendant Arch Telecom's actions, the Plaintiffs suffered significant harm in the form of funds for renovations, lease extensions, loans, lost commissions, and lost future profits.

WHEREFORE, your Plaintiffs pray a judgment against the Defendants in the amount of One Hundred Million Dollars ($100,000,000.00) in compensatory damages, plus punitive damages in the amount of One Billion Dollars, plus attorneys' fees and costs of suit.

**COUNT NINE**
**New York State Franchise Sales Act ("NYFSA")**
**(T-Mobile, Arch Telecom, and PCG)**

95. The Plaintiffs incorporate by reference all of the allegations made above as if the same are fully set forth herein and further state:

96. For that, the Plaintiffs' Agreements with the Defendants constitute a franchise within the meaning of New York General Business Law § 680, *et Seq.* ("NYFSA").

97. The Plaintiffs entered into Agreements that were express or implied, oral and written, pursuant to which the Plaintiffs were granted the rights to engage in the business of selling or distributing goods or services under a marketing plan or system prescribed in substantial part by Defendant T-Mobile, and the Plaintiffs were required to pay, directly or indirectly, a franchise fee. The Plaintiffs paid franchise fees as defined under New York law by paying a security deposit out of which Defendant could deduct payments; they made insurance payments; they paid a bond; and they paid a monthly IT fee.

98. The Defendants intentionally made untrue statements of material facts regarding the creation of "hundreds of stores," and these statements misled the Plaintiffs. The Defendants also concealed from the Plaintiffs their plans to terminate the stores in bad faith, causing the Plaintiffs to invest, renovate and renew their leases. The Defendants continued to give Plaintiffs the false impression that business would proceed as usual by requiring them to renovate their stores, to incur indebtedness through disaster loans, and to renew their leases.

99. The Plaintiffs relied upon Defendants' statements and the concealment of facts. The Plaintiffs would not have signed – for example – the June 2021 Agreements had they known that Defendants were engaging in bad faith and in acts of fraud and concealment.

100. The acts of fraud (the misrepresentations and omissions) perpetrated by the Defendants upon the Plaintiffs were intentional and were committed with malice or its functional equivalent. The Defendants acted with total disregard to Plaintiffs' rights.

WHEREFORE, your Plaintiffs pray a judgment against the Defendants in the amount of One Hundred Million Dollars ($100,000,000.00) in compensatory damages, plus punitive damages in the amount of One Billion Dollars, plus attorneys' fees and costs of suit.

### COUNT TEN
### CIVIL CONSPIRACY
### (T-Mobile and Arch Telecom)

101. The Plaintiffs incorporate by reference all of the allegations made above as if the same are fully set forth herein and further state:

102. For that, in connection with the torts alleged above, the Plaintiffs will prove that T-Mobile civilly conspired with Arch Telecom and that the two committed overt acts in furtherance of the conspiracy.

103. T-Mobile conspired with Arch Telecom to breach PCG's Agreement with Plaintiffs; to act in bad faith as to the Plaintiffs and to breach the implied covenant of good faith and fair dealings; to defraud the Plaintiffs; to conceal information from the Plaintiffs; to negligently misrepresent facts to them; to tortuously interfere with the PCG contracts with the Plaintiffs; among the other torts alleged herein.

104. T-Mobile and Arch Telecom know that the initial terms of the Plaintiffs' Agreements with the PCG expire in or around the middle of June 2024. But, T-Mobile agreed with Arch Telecom that the Defendants can arrive at an artificial termination date; that Arch Telecom would contact the Plaintiffs and take from them whatever stores it can get without compensation, and where Plaintiffs object, to pay as little money as possible for Plaintiffs' stores.

105. To execute their dirty game, the Defendants unlawfully agreed that Arch Telecom may obfuscate the actual termination date and use an artificial date to harass the Plaintiffs out of their contracts. The Defendants terminated the Agreements on an earlier date and attempted to

'work the Plaintiffs over' for months and months, pushing the Plaintiffs out of their contracts and offering them cents on the dollar for their stores.

106. The Defendants took overt acts in furtherance of the conspiracy. T-Mobile lied publicly about its post-merger plans. T-Mobile concealed from Plaintiffs its intention to take over their stores without just and fair compensation. T-Mobile continued to lie to the Plaintiffs about its role in the termination. To be clear, store closures and transfers cannot occur without T-Mobile's knowledge and approval. Yet, T-Mobile continued to misrepresent to Plaintiffs that 'it was Arch Telecom, not I.' It continued to direct Plaintiffs to the Master Dealer, falsely claiming a lack of knowledge of the conspiracy.

107. T-Mobile continued to conceal from Plaintiffs the actual date of the termination of the Agreements. It concealed from the Plaintiffs that it directed Arch Telecom to execute on its closure plans using unethical means. By way of example, T-Mobile agreed that Arch Telecom may use any date of termination that the latter wishes to use and that Arch Telecom may lie about the actual date of termination so long as Arch Telecom gets the job done.

108. T-Mobile worked behind the scenes to facilitate Arch Telecom's bad faith and unjust takeover of the stores.

109. For its part, Arch Telecom overtly acted in furtherance of the conspiracy by causing a Director of the Defendants to contact the Plaintiffs for months and months. In those contacts, the Defendants completely concealed from the Plaintiffs their underhanded plans to eliminate the stores of the Plaintiffs.

WHEREFORE, your Plaintiffs pray a judgment against the Defendants in the amount of One Hundred Million Dollars ($100,000,000.00) in compensatory damages, plus punitive damages in the amount of One Billion Dollars, plus attorneys' fees and costs of suit.

## <u>DEMAND FOR TRIAL BY JURY</u>

The Plaintiffs respectfully demand a trial by jury on all of the issues raised herein.


Respectfully Submitted,

THE PLAINTIFFS

BY:     <u>*John Hermina*</u>
BY:     Their Counsel
        John Hermina, Esquire
        HERMINA LAW GROUP
        8327 Cherry Lane
        Laurel, Maryland  20707
        Tel:  301-776-2003
        john@herminalaw.com

26