**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

Digital Land Wireless, Inc.
3075 Fulton Street
Brooklyn, NY 11207,

Perfect Wireless Two LLC
187 Rivers Edge Drive
Milford, OH 45150,

Kal Electronics Inc.
3218 North Street
Nacogdoches, TX 75965,

Reemas Fashion, Inc.
2521 West State Street
New Castle, PA 16101,

Texas Mobile Solutions LLC
14405 FM2100 Road, Suite L
Crosby, TX 77532,

Dreams of Field LLC
410 Zion Avenue
Winstead, MN 55395,

Veyond Wireless, Inc.
1190 S Elmhurst Road, Suite 203
Mount Prospect, IL 60056,

DNSY, Inc.
3117 N Lewis Ave
Waukegan, IL 60087,

Alpha Cellphone Plus, Inc.
348 Moody Street
Waltham, MA 02453,

DB Wireless LLC
7965 State Road 50
Groveland, FL 34736,

Case No.  23-1582

Mainestream Wireless Inc.
937 Talon Pointe Drive
Bullhead City, AZ 86429

Noblesse & Co.
110 E University Avenue, Ste F
Urbana, IL 61801,

ESP Wireless Inc.
970 Church Road
Palmerton, PA 18071

Making Foods, Inc.
(d/b/a Trust Wireless)
6037 North Fry Road
Katy, TX 77449,

Mobile Media Passaic LLC
586 Main Avenue
Passaic, New Jersey 07011

Global T Management LLC
2199 NW 20th Street, Unit 6
Miami, FL 33142


Plaintiffs,

v.

T-Mobile USA, Inc.
12920 SE 38th Street
Bellevue, WA 98006

**Serve Upon:**
Corporation Service Company
300 Deschutes Way, SW
Suite 208, MC-CSC1
Tumwater, WA 98501,

Arch Telecom Inc.
1940 W Corporate Way
Anaheim, CA 92801,

**Serve Upon:**
Accumera, LLC
911Central Avenue, #101
Albany, NY 12206

Arch Telecom of NY Inc.
1940 W Corporate Way
Anaheim, CA 92801,

**Serve Upon:**
Vijayant Ghai
575 Underhill Blvd., Suite 211
Syosset, NY 11791

and

The Portables Choice Group LLC
136 1st Street
Nanuet, NY 10954

**Serve Upon:**
Lawrence D. Melchionda
136 1st Street
Nanuet, NY 10954

**CLASS ACTION COMPLAINT
AND DEMAND FOR JURY TRIAL**

COME NOW THE PLAINTIFFS, Digital Land Wireless, Inc. ("Digital Land"), Perfect

Wireless Two LLC ("Perfect Wireless"), Kal Electronics Inc ("Kal"), Reemas Fashion, Inc.

("Reemas"), Texas Mobile Solutions LLC ("Texas Mobile Solutions"), Dreams of Field LLC

("Dreams"), Veyond Wireless, Inc. ("Veyond"), DNSY, Inc. ("DNSY"), Alpha Cellphone Plus,

Inc. ("Alpha"), DB Wireless LLC ("DB"), Mainstream Wireless Inc. ("Mainstream"), Noblesse

& Co. ("Noblesse"), ESP Wireless Inc. ("ESP"), Making Foods, Inc. ("Trust Wireless"), Mobile

Media Passaic LLC ("Mobile Media"), and Global T Management LLC ("Global T"), by and

through their undersigned attorneys, John Hermina, Esquire, and the Hermina Law Group, sue the Defendants Arch Telecom Inc., Arch Telecom of NY Inc. (jointly "Arch Telecom"), T-Mobile USA, Inc., ("T-Mobile") and Portables Choice Group, LLC ("PCG"), and as for their complaint, they state:

## **Introduction**

The Plaintiffs, in this case, represent a tiny fraction of the number of the mostly minority-owned businesses who were betrayed by Defendant T-Mobile and its so-called Master Dealers. T-Mobile misled the nation, the Congress of the United States, and the Plaintiffs when its Executive said that "hundreds of stores" would be opened after the merger with Sprint.

It is not corporate greed and dishonesty that the Plaintiffs challenge here. Rather, it is T-Mobile and Defendants' blatant violations of the law which the Plaintiffs seek to address through this action.

## **The Dirty Game of Squeeze and Buy**

T-Mobile played a dirty game of *"squeeze and buy."* T-Mobile knew that the initial terms of the Plaintiffs' Agreements with the Defendants last until June of 2024, but T-Mobile conspired with its Master Dealer (Arch Telecom) to create an earlier and artificial termination date (March 2023).  And, over a period of months and months before March 2023, T-Mobile allowed (and is still allowing) Arch Telecom to contact the Plaintiffs to work them over. When Thomas Salvato of Arch Telecom called the Plaintiffs, he offered to buy their viable and profitable stores for little to nothing. And whenever it can, Arch Telecom attempts to close the Plaintiffs' stores for absolutely zero compensation, depriving them of their livelihood and disgorging them of their investments. This is occurring as of the time this Complaint is being filed.

## Relevant Facts

1. Plaintiff Digital Land is a community-based domestic corporation located in Brooklyn, New York. The Plaintiff has served the Cyprus Hills Community of Brooklyn since 2011, and it previously served East New York since 1998. The sole member of Digital Land is Robert Rodriguez who is a resident of the State of Florida.

2. Plaintiff Perfect Wireless is an Ohio limited liability company. Atef Geneidy is the sole member of Perfect Wireless and is a resident of Ohio. Plaintiff Kal is a Texas company, and its sole shareholder is Shafiqur Rehman who is also a Texas resident. Syed Pasha and Hasan Ijaz are the shareholders of the Texas Mobile Solutions, and they are residents of the State of Texas. Plaintiff Reemas is registered in the Commonwealth of Pennsylvania and its sole shareholder is Mohammed Abu-Kwaik who is a resident of Ohio. The remaining Plaintiffs will set forth the name and residence of each of the members/shareholders of their respective business entities in the paragraphs below, which pertain to each of them. *See* ¶ 48, *et seq*.

3. Defendant T-Mobile USA, Inc. is a for-profit corporation (publicly traded under NASDAQ:TMUS). Defendant is headquartered in Bellevue, Washington.

4. Defendant Arch Telecom Inc. is a corporation with a principal place of business located in Anaheim, CA 92801. Defendant Arch Telecom of NY Inc. is a domestic corporation formed under New York Business Corporation Law §402. Upon information and belief, the two Arch entities are a single integrated enterprise and are jointly responsible for the harm to Plaintiffs as set forth herein. The two Arch entities will hereinafter be referred to as Arch Telecom.

5. During the relevant period, Thomas Salvato was a Director of Arch Telecom. However, Salvato has acted directly and indirectly as an agent of T-Mobile directly and indirectly through various entities such as the Portables Choice Group, LLC ("PCG") and its predecessor companies.

6. Defendant PCG is a New York limited liability company. This Defendant states publicly that it is comprised of two T-Mobile distributors: "Portables Unlimited Inc." and "Choice Products and Services Inc." New York Secretary of State records show the corporate formation of PCG to be March 9, 2021, but Defendant's website suggests that the consolidation occurred in July of that year. PCG claims to operate over 284 T-Mobile stores.

7. Defendant PCG has entered into contractual relationships with each of the Plaintiffs in or around June 2021. Under the terms of the Agreement, the initial term is three (3) years long.

8. Arch Telecom acquired PCG on or around August 18, 2022, and it announced in a public statement to the Plaintiffs and to numerous other dealers that:

> "With this latest acquisition, Arch Telecom's portfolio consists of over 400 locations in 32 states… For all PCG Sub-Dealers, your experience will be business as usual. The majority of PCG TPR-S field and back-office support staff will become a part of Arch Telecom and will continue to support you. Commissions will continue to be paid at the normal cadence. All PCG sub-dealer agreements and guaranty obligations will be transferred to Arch Telecom and remain in full force. All T-Mobile operating and brand standards expectations will remain."

9. Arch Telecom claims to be the third largest T-Mobile retailer, with over 400 stores in the 32 states.

### Choice of Law and Jurisdiction

10. The Agreement between the Plaintiffs and Defendant PCG provides New York as the choice of law, and it requires the parties to consent to the exclusive jurisdiction of certain state courts in the State of New York "and any Federal Court in New York."

### T-Mobile's Role And Its Relationship To Arch Telecom and the Plaintiffs

11. The Plaintiffs are essentially community-based T-Mobile stores, and they are what   T-Mobile and Arch Telecom prefer to call "Sub-Dealers."   T-Mobile and Arch Telecom hold the

latter out to be a "Master Dealer." Using its operating standards, T-Mobile controls substantially

every aspect of the Plaintiffs' business:

- T-Mobile determines the size of the store;
- It determines the signage (to the inch) and the appearance of the store;
- It determines the number of personnel in each store;
- It determines the store hours of workers;
- It has a universal attire uniform policy;
- It establishes the EEO guidelines for each store;
- It establishes social media guidelines;
- It controls the customer relations activity, and it operates a customer service department;
- It determines the refund policies and the restocking fees;
- It controls the product marketing;
- It controls the store inventory;
- It controls financial aspects of the operation of the business, including credit card transactions and the T-Mobile credit cards;
- It controls the sales, and it even sends an armored truck to pick up payments from the stores on a bi-weekly basis;
- It purports to control and determine the commission structure; and
- T-Mobile operates as the master/principal of "master dealers" such as Arch Telecom, directing them to execute such significant actions as store eliminations.

12. As a Master Dealer, PCG and Arch Telecom owed their Sub-Dealers a duty to warn

the Plaintiffs of any events or changes that might impact the Plaintiffs' earnings, store operations,

and livelihood. The District Managers of these Defendants performed audits designed to protect

the Plaintiffs. Defendants were entrusted with honestly interacting with the Plaintiffs, including

the safekeeping and disbursement of their funds. PCG and Arch Telecom are fiduciaries. Among

other things, these Defendants are completely entrusted with holding and disbursing funds

belonging to the Plaintiffs, which Defendants disburse without the necessary transparency and

without actual verification mechanisms.

13. When the acquisition by Arch Telecom of PCG became effective on or about

September 1, 2022, it assumed the liabilities and received the assets of PCG.

**Misrepresentations and Concealment of Material Facts Regarding Store Closures
and the Resultant Harm**

14.  In April of 2018, T-Mobile announced its merger with Sprint, and the Presidents of both companies began a campaign designed to promote the merger and secure the necessary governmental approvals. Among other representations, T-Mobile promised that stores would be created – not eliminated. By way of example, John Legere, CEO of T-Mobile, stated during a 2018 joint announcement with his Sprint counterpart as to the two merged companies:  "we'll build hundreds of stores." https://www.youtube.com/watch?v=1nsbmtwMrgY And, while the reference to building hundreds of stores was made regarding rural areas,  Legere touted "jobs" as "another reason this [merger] deal makes so much sense." In another public appearance in April of 2018, the CEO of Sprint stated, as to the merged company: "We plan to open hundreds and hundreds of new  stores."  https://www.youtube.com/watch?v=RicP_VsQ3ZM  T-Mobile's  public  promises misled each and every one of the Plaintiffs.

15.  T-Mobile never informed Sub-Dealers, prior to the approval of the merger, that it planned to close stores such as Plaintiffs' stores.

16.  Arch Telecom and PCG also concealed from the Plaintiffs and numerous other Sub-Dealers that T-Mobile planned on closing stores – when such information became known to them. This concealment of a material fact continued through the fall of 2022.

17.  T-Mobile managers who went to audit the Plaintiffs' stores continued to represent to Plaintiffs that business is continuing as usual. Some of these managers actually represented to Plaintiffs that T-Mobile is creating more stores, not eliminating them.

18.  In its August 18, 2022 announcement that it acquired PCG and its stores, Arch Telecom stated to the Sub-Dealers that as "Sub-Dealers, **your experience will be business as usual**." It

represented that the Sub-Dealers would continue to receive "support" from the Master Dealer. And, it also represented that "commissions will continue to be paid at the normal cadence."

19. T-Mobile and Arch Telecom continued to pretend as if business was as good as usual, urging Sub-Dealers to continue to renovate and renew existing leases for as long as five (5) years. This gave the Plaintiffs the absolutely false impression that, even after the merger, their respective small businesses would continue to thrive.

20. In reliance on the promises and concealments of T-Mobile, Arch Telecom and PCG, the Plaintiffs incurred significant renovation costs. By way of example, Digital Land incurred over $150,000.00 to raise Plaintiff's Brooklyn store to T-Mobile standards. These renovations, required and approved by T-Mobile and Arch Telecom, included remodeling the space and purchasing new furniture and equipment. Three (3) days before Thanksgiving 2022, Arch Telecom advised Digital Land that the latter "must cease operations and close" its Brooklyn location during March of 2023. Digital Land built a strong business for T-Mobile in a diverse community, and there was no good-faith justification whatsoever for closing that company's doors.

21. In reliance on the promises and concealments, the Plaintiffs renewed their leases, causing them to be indebted for significant rental payments.

22. In reliance on the promises and omissions of fact, the Plaintiffs took out loans during the Pandemic to ensure that the business of T-Mobile continued to survive, thrive and grow. The Plaintiffs – unlike the Defendants – were loyal.

23. The Plaintiffs and numerous other Sub-Dealers entered into the June 11, 2021, contracts in good faith, fully believing the representation that business would go on as usual. When the Plaintiffs attempted to take their time to review the Agreements, PCG sent an email requesting the

return of the executed agreements "by 6/25/21 to avoid any possible DELAYS TO COMMISSION CHECKS." (capital letters in original).

24. At the time the Sub-Dealer Agreements were sent to each of the Plaintiffs, Defendant PCG was under a duty to provide full, complete and truthful information regarding T-Mobile's plans to close and terminate Plaintiffs' stores. PCG breached its duties of care, honesty and loyalty.

25. PCG and/or Arch Telecom were aware of T-Mobile's plans to eliminate Sub-Dealerships, but they failed to provide that information to Plaintiffs. Renovations and renewals were being required and approved, and Arch Telecom was suggesting that business would go on as usual. The Plaintiffs believe, and therefore allege, that T-Mobile planned to close its Sub-Dealer program and it knew that it would be closing Plaintiffs' stores, but it failed to provide the Plaintiffs with information regarding its plans, or its impending closures.

26. As noted above, Arch announced its acquisition of PCG to take place on September 1, 2022. On November 21, 2022, and within approximately two months of the acquisition announcement, Arch Telecom sent Plaintiffs a Notice stating that "T-Mobile USA, Inc. ("T-Mobile") is exercising its right to terminate [your] location… Sub-Dealer must cease operations and close each of its Locations [in March of 2023]."

27. Within days after Arch Telecom notified Plaintiffs that they must close their stores, Plaintiffs and numerous other Sub-Dealers received telephone calls or emails from Thomas Salvato of Arch Telecom. During these calls or in the emails, Mr. Salvato reminded Plaintiffs that T-Mobile has effectively terminated their businesses, but that Arch Telecom would be willing to purchase their stores for a negligible amount of money. The offers did not begin to compensate the Plaintiffs for the cost of renovation (required and approved by T-Mobile), let alone the loss of commissions, investment and profits.

28. Prior to the merger between T-Mobile and Sprint, the closest T-Mobile store to Perfect Wireless Two LLC  ("Perfect Wireless") was seven miles away. The location of the store was considered a rural area, where the T-Mobile Executive had falsely pledged to create "hundreds of stores."

29. Due to the merger, multiple Sprint stores that became T-Mobile stores came within proximity of Plaintiff Perfect Wireless, and the number of T-Mobile stores in that area grew to five, after only being two. Even with the new competition, the store remained productive and there was no justification either for terminating the store, or for failing to compensate the Plaintiff for the bad faith termination.

30. The last of the Agreements entered into between the Plaintiffs and the Defendants was the Sub-Dealer Agreement offered by PCG on June 11, 2021. During a conference call with all of the Sub-Dealers on August 18, 2022, an Arch Telecom Officer informed the Plaintiffs that Arch Telecom acquired PCG, and he promised that Plaintiffs can expect profitability and "business as usual." One day later, the Plaintiffs received the formal Arch Telecom-PCG acquisition announcement stating that the effective date of the acquisition is September 1, 2022.

31. On September 1, 2022, Arch Telecom informed the Plaintiffs and all Sub-Dealers that "T-Mobile has decided to end the [Sub-Dealer] program." On November 21, 2022, Arch Telecom further advised the Plaintiff that the store location was being terminated effective "March 2023."

32. Beginning on June 11, 2021, Defendants PCG and Arch Telecom engaged in the conversion of commission funds, which were to be distributed to Perfect Wireless. The conversion occurred, *inter alia*, when the said Defendants increased the target for the number of activations, which eliminated the threshold for receiving a bonus.

33. The targets, which had been set by T-Mobile, were raised by Defendants with the intent to convert the bonuses, or with intent to deprive the Sub-Dealers of the same. PCG refused to issue the bonus after telephone units were sent to the Defendants, and when the dispute over the bonuses arose, Perfect Wireless requested the return of the telephones, but Defendant PCG refused, keeping both the telephones and the bonuses.

34. Plaintiff Perfect Wireless lost significant funds, as it expected returns on the long term investment in the business, because the program was terminated shortly after the merger. The Plaintiff was forced to buy equipment more expensive than the market price. The Defendants approved a 5-year lease extension. And, the Plaintiff and numerous other Sub-Dealers are now required to repay Pandemic-related disaster-loans, which Plaintiffs had to incur to keep their respective stores open pursuant to Defendants' instructions. In addition to the above losses, the Plaintiff also lost commission earnings and profits.

35. When Defendant T-Mobile represented that it would open "hundreds of stores" nationwide, Kal Electronics had ample reason to believe that it would not only survive, but that it would thrive in the newly-merged company.

36. At the time Kal became a T-Mobile Sub-Dealer, Kal's location was considered rural. While promoting the merger, T-Mobile represented that "hundreds of stores" would be added, particularly in rural areas. This representation was clearly false as Kal experienced first-hand.

37. Kal developed its business and became profitable. Yet, as is the case with other Plaintiffs, Arch Telecom, advised this Plaintiff that T-Mobile would terminate Kal's location effective March 2023.

38. Arch Telecom was unable to explain T-Mobile's and its own tortious conduct in unilaterally terminating Plaintiff Kal's viable business. Presumably, the business was being

terminated because Defendants felt that because of performance or post-merger competition issues, it needed to close. Yet, the Defendants were seeking to take Plaintiff's business and keep it to themselves. Indeed, in the same notice of termination, Arch Telecom's Tom Salvato stated: "We would like to gauge your interest in selling your location to Arch Telecom."

39. Defendant Arch Telecom offered Kal $35,000.00, and the offer kept on increasing until it reached $100,000.00. The Plaintiff could not accept the offer, which represented less than four months of commission earnings. The Plaintiff had spent approximately $120,000.00 to renovate its T-Mobile store. Therefore, Arch Telecom's bad-faith offer was unacceptable. The Plaintiff lost significant funds in the form of investment, renovations, commission earnings, loans, and lost profits.

40. Plaintiff Reemas opened the first T-Mobile location on September 1, 2016, in New Castle, Pennsylvania, and it opened the second location in Canfield, Ohio, on February 20, 2017. Ultimately, the Plaintiff entered into an Agreement with PCG in June of 2021, which was followed by the Arch Telecom's PCG acquisition announcement in August of 2022. Within weeks of the acquisition announcement (and on the same day the acquisition became effective), the Plaintiff received a notice of termination. Specifically, on September 1, 2022, Plaintiff received an email from Thomas Salvato, in which the latter stated that "T-Mobile has decided to end the TPR-S Sub-Dealer program… We would like to gauge your interest in selling your location to Arch Telecom…". Stated differently, the Defendants decided to close the Plaintiff's business but to keep that business for themselves. The Defendants also decided to wrongfully close Plaintiff's second location.

41. Plaintiff Reemas operated two successful T-Mobile stores until it received notices that it must either sell the stores to the Master Dealer or cease to operate altogether. The notices stated that after March 31, 2023, Plaintiff will no longer be able to sell T-Mobile products and services.

42. Reemas' two stores were performing well, and there existed no justification for closing them. Acting in bad faith, Arch Telecom initially offered the Plaintiff $40,000.00 for the two locations, and then the offer was increased to $60,000.00. The higher amount represents approximately two months of commissions, and such amount is completely unfair and unreasonable.

43. As recently as June 2022, T-Mobile insisted that Plaintiff Reemas remodel the New Castle location, and it cost the Plaintiff approximately $80,000.00 for the renovation. In demanding the renovation, T-Mobile conveyed the clear impression that the business would continue at least until 2027. Arch Telecom was clearly operating in bad faith when it attempted to acquire the stores for an amount that is less than what the Plaintiff paid in renovation costs for only one location. The Plaintiff lost funds in the form of investment money, commission earnings, renovations and future profits.

44. Plaintiff Texas Mobile Solutions owned two stores in Houston, Texas, which it operated on behalf of T-Mobile as a Sub-Agent. The Plaintiff served in the capacity of Sub-Dealer since 2015, and a year later, the Plaintiff purchased a third store. By 2017, Texas Mobile Solutions owned a total of six T-Mobile stores. One of the stores opened by the Plaintiff in 2017 was in Leandar, Texas. It was the first T-Mobile store in the area.

45. T-Mobile closed three of Texas Mobile Solutions' stores and it placed signs on the stores redirecting traffic to T-Mobile corporate stores. T-Mobile has closed two stores effective March of

2023, and Arch Telecom has made an offer to purchase the remaining store for the equivalent of less than three-months' commission earnings.

46. All of Plaintiffs' six stores were profitable and there was no justification for closing any of them. The closing of the stores was contrary to the public statements made by T-Mobile and inconsistent with the private conversations the Plaintiff had with T-Mobile's managers.

47. Two stores, which have five-year leases are closing, and Arch Telecom offered to pay $75,000.00 for the one and only remaining store. Plaintiff Texas Mobile Solutions lost funds in the form of investment, commissions, leases, renovations, a loan and lost profits.

### Shattered Dreams and Arch Telecom's Extortionist Conduct

48. Plaintiff Matthew Field is the sole member of Dreams of Field LLC. He is a resident of the State of Minnesota. The Plaintiff began working with T-Mobile and its predecessor in 2008, and eventually it operated five (5) T-Mobile stores.

49. Dreams entered into Agreements with PCG for each of the five (5) stores with an initial term of three years. As the Plaintiff operated in good faith, the Defendants were engaging in planning for the demise of Plaintiff's business. For example, the Plaintiff identified an ideal business location at which he wished to open a new T-Mobile store. Rather than assist Dreams in opening the store, T-Mobile opened the store at the location suggested by the Plaintiff.

50. September 1, 2022 was the effective date that Arch Telecom acquired PCG. On that same day, the Plaintiff received a Notice from Arch Telecom that its stores would be closed purportedly because the Sub-Dealer program was ending.

> As you may be aware, T-Mobile has decided to end the TPR-S Sub-Dealer program. This was originally set to terminate [on] 12/31/22, but due to the acquisition of the PCG T-Mobile portfolio by Arch Telecom this was extended till 3/31/23. After that date, you will no longer be able to sell T-Mobile products and services. We would

like to gauge your interest in selling your location to Arch Telecom for conversion to TPR, provided that it meets our criteria and the economics make sense.

51. Arch Telecom was acting in bad faith and was engaging in self-dealing in total disregard of Plaintiff's rights under the parties' Agreement. The Plaintiff had renewed the leases for at least two of the locations for a five-year period, and Plaintiff was concerned about the consequences of not succumbing to the pressure to close, particularly when the Defendants represented that "[y]ou will no longer be able to sell T-Mobile products and services." The Defendants engaged in fraud because the date provided was neither definite nor certain. The Plaintiff learned that the Defendants lied about the closing date. In fact, Dreams could have operated its store until at least December 31, 2023. The "squeeze and buy" scheme worked well for the Defendants and to Plaintiff's extreme detriment.  It is not enough that Defendants are closing Plaintiff's business and depriving its owner and his family of their livelihood.  In a display of lawlessness and acting as an extortionist, Arch Telecom is now requiring Dreams to sign a general release extinguishing all liability as a condition for payment of due, owing and earned wages. *See* **Exhibit 1.**

52. The Defendants manipulated the commission and bonus payments and withheld documents that could have verified actual earnings. This enabled Arch Telecom to pay lesser amounts in commissions than what was actually due to Plaintiffs such as Dreams.

53. In addition to losing the five stores, Dreams also lost significant amounts of funds in commissions and lost investment and profits.

54. Veyond Wireless, Inc. is an Illinois corporation. Its sole shareholder, Ui Sang Yi, is also a resident of the State of Illinois. The Plaintiff began representing Defendant T-Mobile in or around 2014, and Veyond was required to make a $100,000.00 program payment. On June 11, 2021, the Plaintiff entered into an Agreement with PCG, which it was required to sign under the

threat of delayed commission payments. The Agreement provided for an initial term of three years. The Plaintiff opened this location and invested significant funds in the renovation and remodeling of the store. Veyond was a successful store, earning an average of $35,000.00 per month in commissions. The store served a diverse community and was a popular business. The Plaintiff built a strong customer base for T-Mobile. Veyond brought to T-Mobile a large number of Korean customers that came to the store because they did not speak the English language and yet received the assistance they needed. The store met and exceeded the monthly targets set by T-Mobile, and there was no justification for mandating its closure.

55. On January 5, 2022, Mr. Thomas Salvato contacted Mr. Yi by telephone and informed him that his store would be closing. There was no explanation whatsoever for the bad faith closure of Plaintiff's Veyond T-Mobile store. The store was completely closed at the end of April 2022. T-Mobile went as far as to not provide the Plaintiff with the costs of shutting the store down.

56. As a result of Defendants' actions, the Plaintiff lost commissions, profits, investment funds and costs associated with the bad faith closing of the store.

57. Plaintiff DNSY, Inc. is an Illinois company with a sole shareholder by the name of Danping Jin who is also a resident of the same State. DNSY was created as new company to serve the purposes of T-Mobile. Prior to its opening in 2017, the Plaintiff expended significant funds in renovations and rebuilding of the store to accommodate the requirements of T-Mobile. The Plaintiff received approval from the Defendants to renew its lease for a five-year period ending on December 31, 2028.

58. On June 11, 2021, DNSY received an Agreement from PCG. Defendant PCG threatened to delay commissions if the document was not signed immediately.  The Plaintiff signed the Agreement, which had an initial term of three years.

59. On September 1, 2022, the same day the acquisition of PCG by Arch Telecom became effective, Arch Telecom notified DNSY that T-Mobile was closing the store due to the ending of the Sub-Dealer program. The email falsely stated that after March 31, 2023, "you will no longer be able to sell T-Mobile products and services." In that same email, Arch Telecom asked the Plaintiff if it would sell the store to Arch Telecom. On March 3, 2023, Arch Telecom stated in an email that DNSY could actually sell T-Mobile products and services thus proving that the date, purportedly set by T-Mobile, was not an actual date that was set in good faith. Within the same email, Arch Telecom stated:

> "This also doesn't change Arch Telecom's intention to convert TPRS locations to Arch owned locations in accordance with its already scheduled conversions and transactions pending."

60. That while DNSY continues to operate in accordance with the bad-faith notice of store closure, it is receiving no assistance from the Defendants. The Plaintiff also noticed a significant decline in the commission payments received from Arch Telecom.

61. As a result of Defendants' closure of Plaintiff's store, DNSY has lost future commissions and profits as well as other funds resulting from the taking of an SBA loan.

62. Jeanne Liriano who resides in the State of Massachusetts is the sole shareholder of Alpha Cellphone Plus, Inc. Plaintiff Alpha sold products and services for T-Mobile, and its predecessors, for approximately 23 years. As is the case with the other Plaintiffs, Apha entered into an agreement with PCG providing for an initial three-year term, and this Agreement was signed under the threat of "DELAYS TO COMMISSION CHECKS." Arch Telecom notified the Plaintiff in or around August 18, 2022 that it acquired PCG, effective September 1, 2022.

63. On September 1, 2022, Alpha received an email from Tom Salvato of Arch Telecom claiming that T-Mobile was ending the Sub-Dealer program and that Plaintiff Alpha will "no

longer be able to sell T-Mobile products and services." In the same email, Salvato stated that Arch Telecom "would like to gauge your interest in selling your location to [the Defendant]…" Over several months, Salvato and, at times, the President of Arch Telecom, worked Plaintiff over. The Defendants exerted significant pressures and scare tactics, which placed the Plaintiff in the state of panic, and Alpha was forced to sell its store. Among the representations was that Alpha would no longer receive any support from T-Mobile. Arch Telecom represented that there would be no inventory to sell.  It stated that there would be no right to sell T-Mobile products or services. Arch Telecom never disclosed to Alpha the internal conspiracy between the two companies (T-Mobile and Arch Telecom). It never disclosed the actual communications regarding store terminations or closures. It never informed the Plaintiff that Arch Telecom would simply be taking over and working with T-Mobile instead of Alpha. The Plaintiff had been a viable company and did not need to be replaced by Arch Telecom. There was simply no justification for the unjust taking of Alpha's business. Defendants pressured the Plaintiff into selling the business for approximately three-months' commission.

64. Plaintiff signed an agreement under duress. This agreement was entered into between Defendant Arch Telecom and Alpha, and it purported to release Arch Telecom. The agreement was the product of fraud, duress and misrepresentations, and it is invalid. Moreover, the agreement does not release Defendants T-Mobile and PCG. In any event, this Plaintiff seeks a declaration that the agreement with Arch telecom, which is the result of fraud, to be invalid.

65. In addition to the fraudulent taking of the store by Arch Telecom and T-Mobile, Alpha lost commission payments, investments and lost profits. To add insult to injury, Arch Telecom went as far as to convert (i.e. steal) Plaintiff's rental security deposit.

66. DB Wireless is a Florida LLC. Ms. Bijal Patel is the sole member of the LLC. She is a resident of the State of Florida. DB started representing T-Mobile in or around 2017. Within the same year, the first store was renovated to T-Mobile's satisfaction, followed by the renting and renovation of a second store. DB operated the stores successfully, but in November of 2022, the LLC was notified that T-Mobile would be ending its Sub-Dealer program. The Notice stated that the program was being terminated and advised the Plaintiff that after March 31, 2023, it would no longer be able to sell T-Mobile products and services and that Plaintiff needed to contact Arch Telecom concerning the selling of the store. On November 24, 2022, the Plaintiff received a letter terminating Plaintiff's second location by March 2023, and Arch Telecom advised DB that the wind-down process would begin on that date.

67. In or around October 7, 2022, and less than two months before the Notices of store terminations were received by DB, the Defendants advised the Plaintiff that the store leases "are approved" for a five-year period. Plaintiff's stores were profitable, and there was no valid reason or justification for terminating DB's businesses. Moreover, the Defendants had misrepresented the termination date for one of the stores. On March 2, 2023, the Defendants informed the Plaintiff that T-Mobile had decided to extend the Sub-Dealer program. In truth and in fact, the closing dates are arbitrary and are designed to enable the Defendants, in bad faith, to manipulate the circumstances of the parties transaction to Plaintiff's detriment.

68. As a result of Defendants' tortious acts, the Plaintiff lost money in investment, lease extensions and loans. The Plaintiff had taken out a $150,000.00 loan. The Plaintiff also lost commissions and future profits. This Plaintiff built the location from the ground up. Therefore, while DB accumulated traffic and business for T-Mobile, the Plaintiff unnecessarily suffered initial losses every year while the business developed, in addition to the later losses.

69. Mainstream Wireless Inc. is an Arizona corporation with a sole stockholder, Daniel Nemphos, also residing in that State. Mr. Nemphos specifically moved from the State of Maine to Arizona to open T-Mobile businesses. The area in which the two stores that the Plaintiff opened in Arizona did not have Sub-Dealer or corporate-owned stores. They had never existed in that market. When this Plaintiff began its relationship with T-Mobile and its Master Dealer, Mainstream was required to pay a program deposit in the amount of $35,000.00. Mainstream is another Plaintiff to whom T-Mobile falsely represented that it would create "hundreds of stores" to the primary benefit of rural areas. T-Mobile eliminated two of Plaintiff's stores that are in rural areas.

70. On June 14, 2021, Mainstream signed an Agreement with Defendant PCG providing for an initial term of service of three (3) years. Defendants terminated one of Plaintiff's stores on October 24, 2021. And, on February 27, 2023, the Plaintiff was informed that his Agreement with PCG as terminated as of March 26, 2023. In connection with the closing of Plaintiff's second store, Defendant T-Mobile has shown a callous disregard for the maintenance of consumer information. A shredding bin (CPNI) containing consumer private information (such as dates of birth, credit card numbers, sim cards and social security numbers) has been removed from the business in anticipation of the closing, which leaves Plaintiff with the responsibility of disposing of such critical private information.

71. As a result of T-Mobile's fraud and Defendants' unjustified terminations, Mainstream lost significant funds in its T-Mobile business in the form of investment, lost commissions, lost profits and funds connected with the closing of the business.

72. Noblesse & Co. is an Illinois corporation, and its shareholders, Dohwan Kim and Wonkyo Jung are residents of the same State. Noblesse began selling T-Mobile products and

services in 2018. The Plaintiff signed an Agreement with PCG in mid-June 2021, with an initial term of three years. On January 13, 2022, the Defendants notified the Plaintiff that the lease renewal for five (5) additional years had been approved, but on November 21, 2022, Arch Telecom notified the Plaintiff that T-Mobile is terminating the location. Three days earlier (i.e. on November 18, 2022, Tom Salvato of Arch Telecom sent the Plaintiff an email, in which he stated:

> This is in reference to our previous communications to you about T-Mobile's termination of the TPR-S Sub-dealer program and the potential acquisition/ transition process. As T-Mobile is making significant changes to its retail distribution strategy, we are putting all conversations, acquisitions, and negotiations on hold until we receive clarification from T-Mobile. We will keep you informed as this continues to develop.

73. The bad faith termination was not justified for several reasons, not the least of which is that Plaintiff's store was located in a rural area where T-Mobile had represented that "hundreds of stores" would be created, rather than eliminated. This misrepresentation was directed at the Plaintiff and its shareholders who believed the T-Mobile Officers to be truthful when their statement was made. Noblesse was performing well and it was meeting all of T-Mobile's expectations. And, the Plaintiff believes that it is the only store in the Urbana.

74. Noblesse suffered significant losses in connection with the termination, including loss of commissions and loss of future profits. Moreover, in excepting a long-term relationship with T-Mobile, the Plaintiff took on a significant loan, which it must now repay.

75. Plaintiff ESP Wireless is a Commonwealth of Pennsylvania company. Frances Redline is the single shareholder of ESP and is a resident of Pennsylvania. The Plaintiff sold products and services for T-Mobile since April of 2017. In or around 2019, T-Mobile claimed that it is seeking to expand service to rural areas. ESP's location was considered a rural store, and T-Mobile represented that more stores would be added in rural areas, not subtracted. With the additions, T-

Mobile had falsely promised to aid rural areas and create jobs. For the first three years of its operation, the Plaintiff lost significant funds because of T-Mobile's unfulfilled promised network expansion.

76. As is the case with other Plaintiffs, since Arch Telecom's arrival on the scene, ESP experienced a decline in earnings as bonus goal targets were manipulated by the Defendants. The Defendants did not provide verifications for the declining commissions. In June of 2021, ESP signed an Agreement with PCG providing for an initial term of three years. On October 6, 2021, T-Mobile advised ESP that it is "approved to extend" its lease for an additional 5-year term - effectively extending the lease through May of 2027. On September 1, 2022, the same day that Arch Telecom's acquisition of PCG became effective, Thomas Salvato emailed Plaintiff's Officer and informed him that a termination, which was to occur at the end of 2022 was extended through March 31, 2023. In the same email, Mr. Salvato suggested that ESP sell the location to Arch Telecom. The choice was 'sell to Arch Telecom' or 'shut down.' It became clear that Arch Telecom had misrepresented the purported mandatory date, for that on March 3, 2023, Arch informed the Plaintiff that ESP's termination has been extended until December 31, 2023. The email warned that "[t]his also doesn't change Arch Telecom's intention to convert [Sub-Dealer] locations to Arch owned locations in accordance with its already scheduled conversions and transactions pending."

77. ESP lost significant amounts of money relying on Defendants' false promises. It incurred costs and an SBA loan, and it lost its investment, commissions and profits.

78. Making Foods, Inc. (d/b/a Trust Wireless) is a Texas corporation, and Ryeowon Jo is the sole shareholder. Mr. Jo is a resident of the state of Texas. Trust Wireless was located in Chinatown and was the first store to cater to Chinese residents in Texas. Trust Wireless had been

a T-Mobile Sub-Dealer since 2014. Initially, the Plaintiff performed T-Mobile business with the Portables Unlimited Master Dealer. Eventually, the Plaintiff was offered an Agreement with PCG with an initial term continuing through June 14, 2024. The three-year initial term Agreement was entered into in good faith on the part of the Plaintiff. The Plaintiff had taken out loans trusting and reasonably expecting that T-Mobile would act honestly and that it would maintain the relationship for at least the three years, if not the life of the loan.

79. On December 28, 2021, T-Mobile's Legal Affairs Department sent the Plaintiff a Notice of Termination of the store "effective January 21, 2022." There is no business justification for closing Trust Wireless. The store constituted the sole income and source of livelihood for the Jo family. Making Foods, Inc. lost years of commissions, funds for loans taken during the Pandemic, and lost profits.

80. Mobile Media Passaic LLC is a limited liability company whose member, Sufian Yassin, is a resident of New Jersey. The Plaintiff, Mobile Media, has represented T-Mobile (in one form or another) in the capacity of an agent for 22 years. Mobile Media represented and expanded the T-Mobile brand in the ethnically-diverse area of Passaic, New Jersey. Mr. Yassin believed the representations that with the Sprint merger there would be "new hires." He believed the Master Dealer's representation that the business would continue "as usual." The Defendants engaged in bad faith when they converted a Sprint store into a T-Mobile store to directly displace the Plaintiff, giving him notice of termination of less than three months. The bad faith Notice of Termination came only a few days after the Plaintiff entered into the new contract with PCG. Mobile Media provided the livelihood for Mr. Yassin and his family: it was the sole source of their income, and the Yassins planned on sending their children to college through their hard work and perseverance

24

in running their stores, at least for the three-year initial period of the contract between Mobile Media and the Defendants.

81. On June 11, 2021, Mobile Media entered into an Agreement with PCG. While the Agreement was ambiguous, the Plaintiff understood the term of the Agreement to be for a three-year period. Within days of entering into the Agreement, Mr. Yassin received a telephone call from the Defendant Master Dealer notifying him that he would be "completely shut down" by October 1st of 2021 without any valid justification. On or about July 15, 2021, the Plaintiff protested the unjustified termination with Jon Freier, President of the Consumer Group of T-Mobile USA. The Plaintiff's President requested an explanation as to the sudden and unexpected closure of his store. Two years later and Mr. Freier is yet to respond. The Defendants terminated Plaintiff's business on October 24, 2021.

82. In expectation that the business would continue, Mobile Media took out a disaster loan, which it has to pay. Prior to the bad-faith termination, T-Mobile required Mobile Media to purchase new equipment to meet system requirements and, as a result, the Plaintiff lost significant funds. The Plaintiff also lost commissions, funds invested in the business and future profits.

83. Global T Management LLC ("Global T") and its sole member, Jihad Eldabliz, are residents of Florida. Global T began working with T-Mobil and its predecessors since approximately 2007. The "T" in Plaintiff's name was added by Plaintiff to signify its relationship with T-Mobile. The Plaintiff had various agreements with T-Mobile, the latest of which was entered into through the Master Dealer PCG in June of 2021.

84. In June of 2022, Plaintiff's President received a telephone call from Thomas Salvato stating that one of Plaintiff's locations would be shut down by October 16, 2022. The Plaintiff had purchased the store in 2018. The store had previously (and prior of Plaintiff's purchase of the store)

25

been performing poorly, and the Plaintiff turned it into a successful location. The Plaintiff invested approximately $160,000.00, and in connection with the purchase, Global T inherited a 10-year lease, which is due to expire in 2027. Thus, even though the T-Mobile operation was forcibly ended by the Defendants, the Plaintiff had no choice but to continue to operate another business at a significant loss.

85. The Plaintiff lost significant funds in the form of: investment, lease payments, lost commissions, loan payments (for loans taken out under the belief that the business would continue) and lost profits.

86. Arch Telecom announced the closure of stores and then posed as a guardian angel who is willing to save Plaintiffs by purchasing their location(s). For the most part, the forced distress-sale offers are the equivalent to a few months' commission. These distress-sale offers are for pennies on the dollar, considering: the business investments made by the Plaintiffs, the loans taken, the potential commission earnings, the renovations and the lease extensions, which were entered into at the direction of T-Mobile and/or Arch Telecom.

87. When Plaintiffs contacted T-Mobile to express their shock at the unexpected terminations, executives of T-Mobile directed the Plaintiffs to contact Arch Telecom. And, when Plaintiffs contacted Arch Telecom regarding the business eliminations, they were informed that the decision to terminate was entirely T-Mobile's, but that Arch Telecom is willing to buy some of the stores for a small amount of money. Both T-Mobile and Arch Telecom hid from Plaintiffs an internal conspiracy whereby T-Mobile gave Arch Telecom a termination date, but allowed the latter to squeeze the Plaintiffs by closing whatever stores that it can and buying whatever stores that it wishes to buy. It should be noted that store sales and transfers cannot occur without T-Mobile

approval. Hence, no part of Defendants' dirty game could not be executed upon without the blessing of T-Mobile.

88. T-Mobile's concealed and undisclosed corporate strategy was to eliminate Sub-Dealers nationwide. To achieve its strategy, T-Mobile incentivized Master Dealers such as Arch Telecom to take over well-performing stores such as the ones owned by Plaintiffs. T-Mobile and Arch Telecom deliberately, intentionally and willfully withheld information regarding the actual plans to close Plaintiffs' stores.

89. Upon information and belief, T-Mobile directs Master Dealers to take whatever steps as are necessary to eliminate Sub-Dealers such as the Plaintiffs. T-Mobile is fully aware that these steps include the Master Dealer's sending out of notices terminating the contractual relationship between the Plaintiffs and PCG and causing the Plaintiffs to lose enormous funds in investment, renovation costs, lease extensions, loans, commissions and future revenues.

<u>**COUNT ONE**</u>
<u>**FRAUD**</u>
<u>**(T-Mobile, Arch Telecom and PCG)**</u>

90. The Plaintiffs incorporate by reference all of the allegations made above as if the same are fully set forth herein and further state:

91. For that the Defendants made representations and concealed from the Plaintiffs material facts regarding the plan to eliminate stores, or to keep some of the stores for its Master Dealers. T-Mobile went as far as to misrepresent publicly and to the Plaintiffs that stores would be open and would operate for years to come. Indeed, the misrepresentation of material facts also took the form of advising, encouraging and even requiring the Plaintiffs to renovate their stores and to renew their leases – giving the false impression to Plaintiffs that their small businesses will continue to exist and be profitable. T-Mobile also hid and concealed from Plaintiffs that it agreed with Arch

Telecom to lie to Plaintiffs regarding the actual termination date while pushing the Plaintiffs to simply give up their stores for next-to-nothing, or for absolutely nothing, if it can be done. Arch Telecom hid and concealed from Plaintiffs the actual termination date and its communications with T-Mobile regarding the same.

92. The Plaintiffs justifiably relied upon Defendants' omissions and misrepresentations to their detriment. In fact, the Plaintiffs took significant steps to renew their leases, take out loans and renovate their stores, and these steps were encouraged and approved by T-Mobile, Arch Telecom and PCG.

WHEREFORE, your Plaintiffs pray a judgment against the Defendants in the amount of One Hundred Million Dollars ($100,000,000.00) in compensatory damages, plus punitive damages in the amount of One Billion Dollars, plus attorneys' fees and costs of suit.


## COUNT TWO
## PROMISSORY ESTOPPEL
### (T-Mobile, Arch Telecom, and PCG)

93. The Plaintiffs incorporate by reference all of the allegations made above as if the same are fully set forth herein and further state:

94. For that, alternatively, the Plaintiffs allege that they suffered damages under a promissory estoppel theory.

95. There were explicit promises – by all Defendants – that Plaintiffs can expect to continue to conduct their business at their stores, and such promises were made publicly by T-Mobile and when the Defendants directed and approved renovation plans and lease extensions.

96. The initial term of the Agreement, which the Defendants demanded that the Plaintiff sign, ends in June of 2024.  This is in accordance with ¶13 of PCG's Agreement with each Plaintiff. This further gave each Plaintiff the impression that the relationship was continuous.

97. It was foreseeable to the Defendants that the Plaintiffs would rely upon such promises, and the Plaintiffs were injured as a result of such reliance. Plaintiffs' damages include the taking out disaster loans, renovations, lease renewals, loss of investments, loss of commissions and loss of profits.

WHEREFORE, your Plaintiffs pray a judgment against the Defendants in the amount of Ten Million Dollars ($10,000,000.00) in compensatory damages, plus attorneys' fees and costs of suit.

## COUNT THREE
## NEGLIGENT MISREPRESENTATION
## (T-Mobile, Arch Telecom, and PCG)

98. The Plaintiffs incorporate by reference all of the allegations made above as if the same are fully set forth herein and further state:

99. For that, the Defendants owed the Plaintiffs a duty to exercise care in providing them with accurate and truthful information, which the Defendants knew the Plaintiffs would act upon.

100. The Defendants knew that the Plaintiffs would act upon their statements that stores would be created (not eliminated), that they needed to renovate their stores for the long term, and that they needed to extend their leases in contemplation of extensive future business. The Defendants incurred an additional duty of care when they knew that the Plaintiffs would act on these misrepresentations and the false impressions Defendants gave to Plaintiffs.

101. The Plaintiffs justifiably relied on the statements by engaging in-store renovations, by incurring loan indebtedness and by extending their leases.

102. Defendants' statements, encouragements, and approvals of store renovations were factually and legally caused by Defendant's negligence or lack of due diligence.

103. The Plaintiffs relied on the statements to their detriment.

WHEREFORE, your Plaintiffs pray a judgment against the Defendants in the amount of One Hundred Million Dollars ($100,000,000.00) in compensatory damages, plus attorneys' fees and costs of suit.

### COUNT FOUR
### NEGLIGENCE
### (T-Mobile, Arch Telecom, and PCG)

104. The Plaintiffs incorporate by reference all of the allegations made above as if the same are fully set forth herein and further state:

105. For that T-Mobile, Arch Telecom, and PCG owed the Plaintiffs a duty of care to warn the Plaintiffs of the impending closings of the latter's respective stores. The Defendants are not only contracting parties with the Plaintiffs, but they are also fiduciaries who owed the Plaintiffs an additional duty not to cause the Plaintiffs harm.

106. The Defendants breached these duties by failing to warn the Plaintiffs that stores would be closing, and this caused, factually and legally, Plaintiffs to lose investments, funds for lease extensions, disaster loans, commissions and future profits.

107. Defendants also owed the Plaintiffs a special duty of care when the former continued to urge Plaintiffs to take on loans, renovate the stores, and extend their leases without exercising due diligence in learning that there would be impending store closings.

108. The breaches of these duties of care caused, factually and legally, harm to the Plaintiffs who have lost and will lose millions of dollars on account of Defendants' negligent conduct.

WHEREFORE, your Plaintiffs pray a judgment against the Defendants in the amount of One Hundred Million Dollars ($100,000,000.00) in compensatory damages, plus attorneys' fees and costs of suit.

**COUNT FIVE**
**BREACH OF CONTRACT**
**(PCG and Arch Telecom)**

109. The Plaintiffs incorporate by reference all of the allegations made above as if the same are fully set forth herein and further state:

110. For that, the contracts between the Defendants and the Plaintiffs provide for an initial term of three years beginning in June 2021.

111. The Plaintiffs are entitled to the benefit of the Agreement for at least the initial term. Moreover, Defendant Arch Telecom made written promises in its acquisition announcement that are contractually binding. These promises include: that the "experience will be business as usual," that services by "field and back-office support staff" would continue and that "commissions will continue to be paid at the normal cadence." These promises were breached by Arch Telecom.

112. Upon information and belief, Arch Telecom decided to take advantage of the stressful store-closing period in order to convert as much of Plaintiffs' earnings as possible. During this period, the Plaintiffs were provided with even less opportunity to verify the accuracy of commission and bonus payments than in the past.

113. The Defendants breached the promises of providing support to the stores. The Plaintiffs were not receiving help with the sales, as they had in the past, and the store visits by Defendants were substantially reduced.

114. More significantly, prior to the execution of Defendants' plans to close Plaintiffs' businesses, the Plaintiffs participated in regular weekly conference calls, which were essential to

gaining information that impacts Plaintiffs' income, such as announcements of impending enhanced and bonus earnings.

115. In further breach of their agreements with Plaintiffs, since on or about September 1, 2022, the Defendants have discontinued such weekly telephone conferences.

116. The Defendants discontinued the over-the-telephone sales support, which they used to provide to the Plaintiffs.

117. Arch Telecom was under a contractual duty to make prompt and accurate commission and bonus payments to the Plaintiffs. Since September 1, 2022, this contractual obligation was consistently and invariably breached. And, these breaches caused Plaintiffs substantial harm.

118. The Plaintiffs have performed all conditions precedent under the Agreements and have attempted to secure Defendants' retraction of the breaches to no avail.

119. As a result of the breaches, the Plaintiffs have lost significant funds in the form of investments, loans, lease extensions, renovations, lost commissions, and lost profits.

WHEREFORE, your Plaintiffs pray a judgment against the Defendants in the amount of One Hundred Million Dollars ($100,000,000.00) in compensatory damages, plus attorneys' fees and costs of suit.

<u>**COUNT SIX**</u>
<u>**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALINGS**</u>
<u>**(PCG and Arch Telecom)**</u>

120. The Plaintiffs incorporate by reference all of the allegations made above as if the same are fully set forth herein and state:

121. For that Defendants PCG and Arch Telecom worked directly with T-Mobile to prevent Plaintiffs from enjoying the benefits under the contracts. Pursuant to New York law, under

circumstances such as those alleged in this case, the Plaintiffs may assert a claim that is separate from their count for breach of contract.

122. Implied in the contracts between the Plaintiffs, on the one hand, and PCG and Arch Telecom, on the other, is a covenant of good faith and fair dealings. Pursuant to the covenant, the Defendants were to refrain from depriving the Plaintiffs of the fruits and benefits under the agreements.

123. Arch Telecom and PCG were required to act in good faith and act fairly and to refrain from engaging in self-dealing. First, these Defendants required the Plaintiffs to sign an Agreement under the threat of withholding commissions. Then, they sent out announcements that Plaintiffs' stores would be closing on particular dates, but Arch Telecom and PCG literally lied regarding these dates. Within the same notices that they sent to Plaintiffs advising that they must "close" their doors, Arch Telecom stated that it wanted to "buy" those stores. This pressure is bad faith. This self-dealing is grossly unfair. And, the Defendants, without question, violated the implied covenant of good faith and fair dealings in this action.

124. As an example of Defendants' bad faith, PCG threatened to delay commissions payments if the Plaintiffs did not sign the June 2021 Agreements. The Plaintiffs were forced to accept the Agreements with all of the unconscionable provisions without any meaningful opportunity to review the Agreements or to consult with counsel.

125. PCG and Arch Telecom breached the implied covenant of good faith and fair dealings when they attempted to terminate PCG's Sub-Dealer Agreements with the Plaintiffs - in some instances, within days of signing the Agreements - where no grounds for such terminations existed. Plaintiffs' stores were performing to Defendants' expectations. They brought to Defendant T-

Mobile goodwill in Plaintiffs' respective communities, and in return, the Defendants betrayed the Plaintiffs.

126. Arch Telecom claimed that the terminations came from T-Mobile, but upon information and belief, Arch Telecom was merely directed by T-Mobile to perform the dirty work of grabbing Plaintiffs' stores – irrespective of how the stores performed. T-Mobile left Arch Telecom to decide the means by which to eliminate Plaintiffs' stores; ergo, it deliberately left for Arch Telecom the manner in which to deprive all Plaintiffs of their commission earnings and their livelihood. Alternatively, it conspired with Arch Telecom to the same effect.

127. As further example of Defendants' bad faith is PCG and Arch Telecom's moving of the target number for earning a bonus so as to deprive Plaintiffs of such earnings. The said Defendants made claims that the Plaintiffs did not achieve particular metrics in order to reduce Plaintiffs' commissions without providing Plaintiffs with the confirming data. Additionally, because of the lack of support and lack of access to reporting from Arch Telecom, there is no clarity as to what commissions are due to the various employees of the Plaintiffs who have family obligations and must be compensated.

128. Arch Telecom has been collecting fees out of commission payments, but it has failed – since it acquired PCG – to provide any of the services for which it collects such fees.

129. As part of the "squeeze and buy" scheme, the Plaintiffs have received no support or information needed to operate the stores. Arch no longer assists with the employee background screenings, which is a function that the Defendant undertook to perform. The Defendants have not provided any information regarding the status of residuals. Moreover, the Plaintiffs have been left in complete disarray with respect to the closing of the stores. The Defendants have not informed

the Plaintiffs as to how to deal with outstanding leases that are as long, in some instances, as five years.

130. Defendants' elimination of the assistance in sales and their refusal to resume the weekly telephone conferences - where Plaintiffs were directly informed of earning opportunities - constitute bad faith and lack of fair dealings. Indeed, this is part of Defendants' plans to "squeeze and buy" whenever possible and to force Plaintiffs to fail due to the lack of support.

131. Arch Telecom acted in bath faith when it caused the Plaintiffs to believe that 'all is well' and that they should renew their leases and conduct their renovations. Arch Telecom hid from the Plaintiffs the fact that the renovations would only benefit Arch Telecom, which planned all along to take over the stores or close them in favor of T-Mobile.

WHEREFORE, your Plaintiffs pray a judgment against the Defendants in the amount of One Hundred Million Dollars ($100,000,000.00) in compensatory damages, plus attorneys' fees and costs of suit.

## COUNT SEVEN
## TORTIOUS INTERFERENCE WITH CONTRACTS
### (T-Mobile)

132. The Plaintiffs incorporate by reference all of the allegations made above as if the same are fully set forth herein and further state:

133. For that, contracts existed between the Plaintiffs and PCG, and T-Mobile was aware of such contracts.

134. T-Mobile intentionally procured PCG's breach of contract without justification. Specifically, T-Mobile directed Arch Telecom to close Plaintiffs' stores regardless of how such stores perform. Plaintiffs' stores were meeting the Defendants' performance expectations, and

there is no economic or other valid justification for T-Mobile's tortious conduct in inducing the breaches of contracts.

135. T-Mobile's conduct was intentional, and its tortious acts were committed with malice or its functional equivalent.

136. Due to Defendant T-Mobile's actions, the Plaintiffs suffered significant harm in the form of funds for renovations, lease extensions, loans, lost commissions, and future profits.

WHEREFORE, your Plaintiffs pray a judgment against the Defendants in the amount of One Hundred Million Dollars ($100,000,000.00) in compensatory damages, plus punitive damages in the amount of One Billion Dollars, plus attorneys' fees and costs of suit.

## COUNT EIGHT
## TORTIOUS INTERFERENCE WITH CONTRACTS
### (Arch Telecom)

137. The Plaintiffs incorporate by reference all of the allegations made above as if the same are fully set forth herein and further state:

138. For that, there existed contracts between the Plaintiffs and PCG. Arch Telecom was aware of such contracts.

139. Arch Telecom intentionally procured PCG's breach of contract without justification. Specifically, Arch Telecom ended Plaintiffs' contractual relations with PCG, thereby severely damaging the Plaintiffs economically. The Plaintiffs were meeting the Defendants' performance expectations, and there is no economic justification for Arch Telecom's tortious conduct in inducing the breaches of contracts.

140. Arch Telecom's conduct was intentional, and its tortious acts were committed with malice or its functional equivalent.

141. As a result of Defendant Arch Telecom's actions, the Plaintiffs suffered significant harm in the form of funds for renovations, lease extensions, loans, lost commissions, and lost future profits.

WHEREFORE, your Plaintiffs pray a judgment against the Defendants in the amount of One Hundred Million Dollars ($100,000,000.00) in compensatory damages, plus punitive damages in the amount of One Billion Dollars, plus attorneys' fees and costs of suit.

**COUNT NINE**
**New York State Franchise Sales Act ("NYFSA")**
**(T-Mobile, Arch Telecom, and PCG)**

142. The Plaintiffs incorporate by reference all of the allegations made above as if the same are fully set forth herein and further state:

143. For that, the Plaintiffs' Agreements with the Defendants constitute a franchise within the meaning of New York General Business Law § 680, *et Seq.* ("NYFSA").

144. The Plaintiffs entered into Agreements that were express or implied, oral and written, pursuant to which the Plaintiffs were granted the rights to engage in the business of selling or distributing goods or services under a marketing plan or system prescribed in substantial part by Defendant T-Mobile, and the Plaintiffs were required to pay, directly or indirectly, a franchise fee. The Plaintiffs paid franchise fees as defined under New York law by making a program payment and by paying a program security deposit out of which Defendant could deduct payments; they made insurance payments; they paid a bond; and they paid a monthly IT fee.

145. The Defendants intentionally made untrue statements of material facts regarding the creation of "hundreds of stores," and these statements misled the Plaintiffs. The Defendants also concealed from the Plaintiffs their plans to terminate the stores in bad faith, causing the Plaintiffs to invest, renovate and renew their leases. The Defendants continued to give Plaintiffs the false

impression that business would proceed as usual by requiring them to remodel their stores, to incur indebtedness through disaster loans, and to renew their leases.

146. The Plaintiffs relied upon Defendants' statements and the concealment of facts. The Plaintiffs would not have signed – for example – the June 2021 Agreements had they known that Defendants were engaging in bad faith and in acts of fraud and concealment.

147. The acts of fraud (the misrepresentations and omissions) perpetrated by the Defendants upon the Plaintiffs were intentional and were committed with malice or its functional equivalent. The Defendants acted with total disregard to Plaintiffs' rights.

WHEREFORE, your Plaintiffs pray a judgment against the Defendants in the amount of One Hundred Million Dollars ($100,000,000.00) in compensatory damages, plus punitive damages in the amount of One Billion Dollars, plus attorneys' fees and costs of suit.

## COUNT TEN
## CIVIL CONSPIRACY
## (T-Mobile and Arch Telecom)

148. The Plaintiffs incorporate by reference all of the allegations made above as if the same are fully set forth herein and further state:

149. For that, in connection with the torts alleged above, the Plaintiffs will prove that T-Mobile civilly conspired with Arch Telecom and that the two committed overt acts in furtherance of the conspiracy.

150. T-Mobile conspired with Arch Telecom to breach PCG's Agreement with Plaintiffs; to act in bad faith as to the Plaintiffs and to breach the implied covenant of good faith and fair dealings; to defraud the Plaintiffs; to conceal information from the Plaintiffs; to negligently misrepresent facts to them; to engage in tortious interfere with the PCG contracts with the Plaintiffs; among the other torts alleged herein.

151. T-Mobile and Arch Telecom know that the initial terms of the Plaintiffs' Agreements with the PCG expire in or around the middle of June 2024. But, T-Mobile agreed with Arch Telecom that the Defendants can arrive at an artificial termination date; that Arch Telecom would contact the Plaintiffs and take from them whatever stores it can take without compensation, and/or to pay as little money as possible for Plaintiffs' stores.

152. To execute their dirty game, the Defendants unlawfully agreed that Arch Telecom may obfuscate the actual termination date and use an artificial date to harass the Plaintiffs out of their stores. The Defendants terminated the Agreements on an earlier date and attempted to 'work the Plaintiffs over' for months and months, pushing the Plaintiffs out of their contracts and offering them cents on the dollar for their stores.

153. The Defendants took overt acts in furtherance of the conspiracy. T-Mobile lied publicly about its post-merger plans. T-Mobile concealed from Plaintiffs its intention to take over their stores without just and fair compensation. T-Mobile continued to lie to the Plaintiffs about its role in the termination. To be clear, store closures and transfers cannot occur without T-Mobile's knowledge and approval. Yet, T-Mobile continued to misrepresent to Plaintiffs that 'it was Arch Telecom, not I.' It continued to direct Plaintiffs to the Master Dealer, falsely claiming a lack of knowledge of the conspiracy.

154. T-Mobile continued to conceal from Plaintiffs the actual date of the termination of the Agreements. It concealed from the Plaintiffs that it directed Arch Telecom to execute on its closure plans using unethical means. By way of example, T-Mobile agreed that Arch Telecom may use any date of termination that the latter wishes to use and that Arch Telecom may lie about the actual date of termination so long as Arch Telecom gets the job done.

155. T-Mobile worked behind the scenes to facilitate Arch Telecom's bad faith and unjust takeover of the stores.

156. For its part, Arch Telecom overtly acted in furtherance of the conspiracy by causing a Director of the Defendants to contact the Plaintiffs for months and months. In those contacts, the Defendants completely concealed from the Plaintiffs their exact underhanded plans to eliminate the stores of the Plaintiffs.

WHEREFORE, your Plaintiffs pray a judgment against the Defendants in the amount of One Hundred Million Dollars ($100,000,000.00) in compensatory damages, plus punitive damages in the amount of One Billion Dollars, plus attorneys' fees and costs of suit.

### COUNT ELEVEN
### CONVERSION
### (Arch Telecom/PCG)

157. The Plaintiffs incorporate by reference all of the allegations made above as if the same are fully set forth herein and further state:

158. By way of background, the inability to receive funds held in trust with Arch Telecom, impacts Plaintiffs' ability to pay their employees and operate their stores. When funds are converted by Arch Telecom and PCG, it creates a decline in income, which also impacts the morale of the stores and contributes to the overall decline in the health of the business.

159. For that since September 1, 2022, the day Arch Telecom effectively acquired PCG, which is also the same day that Arch Telecom began to send notices of closure of Plaintiffs' stores, the Defendants intentionally and without authority assumed or exercised control over funds belonging to the Plaintiffs. This conduct interfered with Plaintiffs' right of possession to Plaintiffs' funds. Specifically, the Plaintiffs had a possessory interest in monies sent to Arch Telecom and PCG for distribution to Plaintiffs, and these Defendants engaged in a practice of keeping portions

of Plaintiffs' funds, until the Plaintiffs demanded them. In the event that Plaintiffs did not make demands, the funds are kept. There is also a pattern and practice by the Defendants, Arch Telecom and PCG, of frustrating Plaintiffs when inquiries are made, to the point that many simply give up their claims for the converted funds.

160. This trespassory taking of Plaintiffs' monies by Arch Telecom was in derogation of the Plaintiffs' rights.

161. Two examples illustrate Defendant Arch Telecom's conversion of Plaintiffs' funds. The first illustration: Plaintiff Perfect Wireless received a commission/bonus check from Arch Telecom in the amount of $1,009.00 as payment for the month of January 2023. The $1,000.00 payment represents a significant departure from the average payment of $15,000.00 for the same level of activities per month. Not until Perfect Wireless made an inquiry, did it learn that Arch Telecom was keeping the majority of the former's money for January 2023.

162. The second illustration: Plaintiff Texas Mobile Solutions received $11,172.00 as payment for commissions and bonuses for the month of January 2023. The payment should have been $25,270.00, if measured against the earnings in January of 2022 where the activities were similar. Over months and years, this conversion can net the Defendants substantial amounts of money, which, in fairness, belongs to the Plaintiffs.

163. The Defendants have withheld from Plaintiffs methods of verification and have denied the latter the tools with which to determine what amounts have been kept by Arch Telecom and PCG.

WHEREFORE, your Plaintiffs pray a judgment against the Defendants in the amount of One Hundred Million Dollars ($100,000,000.00) in compensatory damages, plus punitive damages in the amount of One Billion Dollars, plus attorneys' fees and costs of suit.

**COUNT TWELVE**
**UNJUST ENRICHMENT**
**(Arch Telecom/PCG)**

164. The Plaintiffs incorporate by reference all of the allegations made above as if the same are fully set forth herein and further state:

165. For that the Defendants have retained money that belongs to the Plaintiffs, and neither Arch Telecom nor PCG is entitled to such funds.

166. It would be contrary to equity and good conscience to permit the Defendants to keep Plaintiffs' monies.

WHEREFORE, your Plaintiffs pray a judgment against the Defendants in the amount of Ten Million Dollars ($10,000,000.00) in compensatory damages, plus costs of suit.

**COUNT THIRTEEN**
**ACCOUNTING**
**(T-Mobile/Arch Telecom/PCG – Commission and Bonus Payments)**

167. The Plaintiffs incorporate by reference all of the allegations made above as if the same are fully set forth herein and further state:

168. For that the amounts of earnings to which Plaintiffs are entitled are uncertain and cannot be calculated based on the information available to the Plaintiffs. Arch Telecom does not permit Plaintiffs to have any access to any records showing amounts received by T-Mobile in trust for the Plaintiffs. There is no access to internal reports received from T-Mobile. Instead, the reports prepared by Arch Telecom are self-serving and are created by that Defendant. There is also no accounting for the funds (or percentages) received by Arch Telecom, which would operate as a possible manner for verifying what is due to Plaintiffs.  In essence, Arch Telecom and PCG pay the Plaintiffs only the amounts that the former deem appropriate.

169. The relationship between the Plaintiffs and the Defendants demonstrate that the legal remedy cannot be adequate without an accounting. The amounts truly due and owing are within the exclusive knowledge of the Defendants.

170. The Defendants owe the Plaintiffs a fiduciary duty to fairly and honestly pay the amounts held in trust with them by T-Mobile for the benefit of the Plaintiffs and their stores, and the accounts at issue are so complicated that the Plaintiffs cannot assert a specific sum due (as opposed to the estimate prayed for herein) without an accounting.

WHEREFORE, your Plaintiffs request that this Honorable Court Order the Defendants to account for all amounts received from T-Mobile for payment to Arch Telecom, PCG and the Plaintiffs and to permit for the inspection of any and all electronic records relating to the transactions at issue.

Respectfully Submitted,

THE PLAINTIFFS

BY:   *John Hermina*
BY:   Their Counsel
       John Hermina, Esquire
       HERMINA LAW GROUP
       8327 Cherry Lane
       Laurel, Maryland  20707
       Tel:  301-776-2003
       john@herminalaw.com

## **DEMAND FOR TRIAL BY JURY**

The Plaintiffs respectfully demand a trial by jury on all of the issues raised herein.

Respectfully Submitted,

THE PLAINTIFFS

BY:   *John Hermina*
BY:   Their Counsel
      John Hermina, Esquire
      HERMINA LAW GROUP
      8327 Cherry Lane
      Laurel, Maryland  20707
      Tel:  301-776-2003
      john@herminalaw.com